## Case No. 16,639.

UNITED STATES v. WARD.

[Woolw. 17; McCahon, 199; 1 Kan. 601.] [2]

Circuit Court, D. Kansas. May Term, 1863.

FEDERAL JURISDICTION OF MURDER—JURISDICTION OVER INDIAN RESERVATIONS IN KANSAS.

1. Congress is competent to legislate in respect of murder only where the crime is connected with some subject matter, or was com-

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Reported by James M. Woolworth, Esq., and here reprinted by permission. McCahon, 199, and 1 Kan 601, contain only partial reports.]

mitted in some place, which brings it within the exclusive jurisdiction of the federal government.

2. The act of June 30, 1834 (4 Stat. 729), confers upon the federal courts jurisdiction of offences against the laws of the United States, committed on Indian reservations in Kansas, unless subsequent legislation has withdrawn the locality from that jurisdiction.

[Cited in U. S. v. Stahl, Case No. 16,373; U. S. v. Sa-coo-da-cot, Id. 16,212; U. S. v. Bridleman, 7 Fed. 896.]

3. The act admitting the state into the Union withdraws all such territory from the federal jurisdiction, with an exception therein stated.

[Cited in U. S. v. Yellow Sun, Case No. 16,-780; U. S. v. Sa-coo-da-cot, Id. 16,212; U. S. v. Downing, Id. 14,991; U. S. v. Bridleman, 7 Fed. 896; U. S. v. McBratney, 104 U. S. 623.]

[Cited in County of Cherry v. Thacher, 32 Neb. 350, 49 N. W. 352; State v. McKenney (Nev.) 2 Pac. 172.]

4. The exception mentioned in the act, of territory thus withdrawn from the federal jurisdiction, is territory of Indians having treaties with the United States, which provide, that without their consent, such territory shall not be subjected to state jurisdiction.

[Cited in U. S. v. Yellow Sun, Case No. 16,-780; Ex parte Forbes, Id. 4,921; U. S. v. Downing, Id. 14,991; U. S. v. Martin, 14 Fed. 823; U. S. v. Partello, 48 Fed. 673; Langford v. Monteith, 102 U. S. 146.]

5. The converse is inferable, that Indian territory, not protected by such treaty, is brought within and subjected to state jurisdiction.

[Cited in U. S. v. Partello, 48 Fed. 673.]

This was an indictment for murder. The defendant was a white man, and the person killed was also a white man. The homicide was committed on the reservation of the Kansas tribe of Indians, and in the county of Lyons. This reservation was provided by a treaty with the tribe, and was occupied by it. It was a small tract, nine miles in width, by fourteen in length. It lay in three counties of the state—namely, Waubunee, Morris, and Lyons; which counties were organized, and the courts of the state, with general civil and criminal jurisdiction, were held in each. To the indictment there was a plea to the jurisdiction, by which the defendant insisted that the offence charged against him was not committed within the exclusive jurisdiction of the United States, and that the courts of the state of Kansas could alone take cognizance of it. To this plea there was a demurrer. The question was, whether the reservation of the Kansas Indians was within the sole and exclusive jurisdiction of the United States. In determining this question, the court examined the following provisions of law: The act entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers," approved June 30, 1834 (4 Stat. 729), in its 1st section provides: "That all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and also that part of the United States east of the Mississippi river, and not within any state, to which the Indian title

has been extinguished, for the purposes of this act, be taken and deemed to be the Indian country;" and in its 25th section it provides: "That so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States, shall be in force in the Indian country, provided the same shall not extend to crimes committed by one Indian against the person or property of another Indian." The act entitled "An act for the admission of Kansas into the Union," approved January 29, 1861 (12 Stat. 126), provides in its 1st section: "That the state of Kansas shall be, and is hereby declared to be, one of the United States of America, and admitted into the Union on an equal footing with the original states, in all respects whatever;" * * * "provided that nothing contained in the said constitution (of the state) respecting the boundary of said state, shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with such Indian tribe, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the state of Kansas, until said tribe shall signify their assent to the president of the United States, to be included within said state."

MILLER, Circuit Justice. The circumstances, much enlarged upon at the bar, that the reservation is but a small tract of country, that emigration has filled up the adjoining lands, that the state has included the locus in quo within an organized county, and by its courts of justice, and its people, by their customs and intercourse, have assumed new and close relations to this tribe of Indians, afford no assistance in determining the question before us. The argument drawn from these circumstances assumes that the state has authority to legislate over these lands; and that is the very point in question. Or, if it be conceded that at one time the sole and exclusive jurisdiction was in the United States, the contention of the counsel for the defendant is based on the assumption that circumstances—the changed condition of affairs—has withdrawn that jurisdiction from the federal and conferred it upon the state government: the statement of which position shows its fallacy. We must recur to the provisions of law as written in the statute books and the treaties, for an answer to the question before us. Worcester v. Georgia, 6 Pet. [31 U. S.] 515; U. S. v. Cisna [Case No. 14,795]. The authority of congress to provide for the punishment of crime is limited to such subjects and circumstances as are peculiar to the federal government. That government may coin money, and therefore congress may provide for the punishment of counterfeiting the national coin. It may establish post-offices and post-roads, and may punish robbing its mails; but it cannot punish counterfeiting the issues of state banks, nor robbing express companies. It may punish murder, when it is committed under certain circumstances or in certain places, as when the murdered person is its officer, and at the time of the assault was in the discharge of his official duties, and the killing was in resistance to him therein; or when the homicide was committed in some place over which the national government had sole and exclusive jurisdiction, as, for instance, over forts, arsenals, &c.

Jurisdiction is claimed here to punish this homicide, because it was committed on an Indian reservation. That circumstance alone is not sufficient to give us jurisdiction. There is no act of congress giving the federal courts jurisdiction of every murder committed on any Indian reservation. We have jurisdiction only when such reservation is "within the sole and exclusive jurisdiction of the United States." The act of June 30, 1834, provides, that the section of country in which this reservation is situated shall be Indian country, and that the laws of the United States for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States, shall be in force therein. This provision brings the reservation within our jurisdiction. If it remained unchanged or unqualified, it would conclude the question. It is insisted that the provisions of the act organizing the territory, and the act admitting the state into the Union, withdraw the locality from the force and effect of the act. It is unnecessary to consider the former of these enactments, as all that can be claimed under it, may be found in the latter. The first clause of this act provides that the state shall be admitted into the Union, "on an equal footing with the original states, in all respects whatever." Congress does not possess the power to withdraw from any one of the original states, without its consent, the authority to try and punish a man for murder, even in the smallest portion of its territory. It cannot be said of the new state of Kansas, that she stands upon "an equal footing with the original states in all respects whatever," if congress can take from her courts, and vest in us, jurisdiction to try a man for murder committed within the state;—if congress can, without her consent, exclude her from the right and the power to enforce the laws which she has made, for the protection of the lives, persons, and property of her citizens, on every portion of her soil. This power to enforce her criminal laws throughout her boundaries, which is un-

qualified· and exclusive, and is to be possessed, enjoyed, and exercised by the new state alone, and not concurrently with the federal government, is a necessary incident to her equality with the original states. It follows, then, unless the clause above cited in the act admitting Kansas into the Union is qualified by some other provision, it operates as a repeal of the act of 1830, so far as that state is concerned, and we are without jurisdiction.

But there were, at·the time of the passage of the act of admission, tribes of Indians within the boundaries of the new state, as described therein, with which the United States had treaties; and in these treaties the government stipulated that their lands should never be brought within the bounds, nor subjected to the jurisdiction, of any state. Among other such tribes, we may mention the Shawnees. A treaty had been made with this tribe, giving and assuring to it certain lands; and by the 10th article it was provided, that "the United States guarantee that said lands shall never be within the bounds of any state or territory, nor subject to the laws ·thereof. 7 Stat. 355, 357. It is evident that the congress which passed the act of admission apprehended the principle above expressed, and foresaw the predicament in which the United States would be placed, if it admitted the state without any provision for such Indians, and for the lands of such Indians, as had treaties containing such a guarantee. It was foreseen that when once Kansas was admitted into the Union upon an equal footing with the original states in all respects whatever, the general government could not protect these obligations. Accordingly a proviso was annexed to the clause declaring Kansas in the Union. By this proviso, all territory was excepted out of, and was not to be included within, the state, which belonged to a tribe having such a treaty. So that, recurring to the case of the Shawnees, their reservation was not in the state. It was within the outside boundaries of the state, as described in its constitution, and yet was without the state, without its jurisdiction, and without its territory. And the converse of this proposition is inferable; that is, that congress intended to, and did, concede to the new state, and it acquired and holds irrevocably, except as it sees fit to surrender the same, full right and authority to legislate, to enforce her laws, and to exercise plenary jurisdiction, over all such parts of her territory as were not covered by such treaties. Or rather, to express the matter more exactly, all territory which was not covered by such treaties was included within the state, within its jurisdiction and within its territory; and this irrevocably, unqualifiedly, and exclusively.

It remains now to inquire whether the reservation here in question is within ·the proviso; whether the Kansas tribe of Indians, upon whose reservation this homicide was committed, had such a treaty with the United States, as the Shawnees have been shown to have had, in which it was guaranteed to them by the United States that their reservation should not be brought within any state, nor subjected to its laws. If it had a treaty with such a clause, then the reservation was not in the state, and is subject to federal jurisdiction. On the other hand, if it had not a treaty with such a clause, then the reservation was within the state, and is subject to the state jurisdiction. This question is to be determined by an examination of the treaty with this tribe, in order to see whether or not it contains such a clause. The last treaty with the tribe was made in 1859, and ratified in 1860. (12 Stat. 1111), and is before us. We have carefully examined it, and find that it does not contain the guarantee mentioned. It is conceded by the counsel for the government, that none exists in any former treaty with this tribe. It therefore results that the state of Kansas has jurisdiction to try and punish the defendant for the offence set forth in this indictment: it follows that we have not jurisdiction. The case of U. S. v. Bailey [Case No. 14,495], although decided before the act of 1834 was passed, and therefore not directly in point, is, in its reasoning, strongly corroborative of the views which we have taken. No other case decided by a federal court, bearing on the case before us, has been brought to our attention.

The demurrer to the plea must be sustained, and the case dismissed for want of jurisdiction. Demurrer sustained and bill dismissed.

See The Kansas Indians, 5 Wall. [72 U. S.], 737; and The New York Indians, Id. 761.