**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 30 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

SAC AND FOX NATION OF
MISSOURI; IOWA TRIBE OF KANSAS
AND NEBRASKA; KICKAPOO TRIBE
OF INDIANS, of the Kickapoo
Reservation in Kansas,

      Plaintiffs-Appellees,

v.

KARLA PIERCE, Secretary, Kansas
Department of Revenue,

      Defendant-Appellant.

No. 99-3019

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 95-CV-4152)
(31 F. Supp. 2d 1298 & 45 F. Supp. 2d 859)

---

John R. Shordike of Alexander & Karshmer (Stephen D. McGiffert and Mark S.
Gunnison of Payne & Jones, Chartered, Overland Park, Kansas; Paul Alexander of
Alexander & Karshmer, Washington, D.C.; and Mario Gonzalez, Horton, Kansas,
with him on the brief), Berkeley, California, for Plaintiffs-Appellees.

John Michael Hale, Special Assistant Attorney General, Legal Services Bureau,
Kansas Department of Revenue, Topeka, Kansas, for Defendant-Appellant.

---

Before **BALDOCK**, **BRORBY**, and **LUCERO**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

The State of Kansas imposes a tax, subject to enumerated exceptions, on the distribution of motor fuel to retailers within the State. Kan. Stat. Ann. § 79-3408(a) (1999 Supp.). The distributor, rather than the retailer, is responsible for remitting the tax. Id. § 79-3408(c). When the Kansas Department of Revenue announced its intention to begin collecting tax on motor fuel distributions to retail gasoline stations on Indian lands within the State, three federally-recognized Indian Tribes, the Sac and Fox Nation of Missouri; the Iowa Tribe of Kansas and Nebraska; and the Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas (the Tribes), filed suit in federal district court to enjoin the State from collecting its tax on fuel distributed to the Tribes' retail stations. The principal issue before us is whether the State of Kansas may impose its motor fuel tax as currently designed on fuel distributed to these retail stations on Indian lands within the State.

## I.

The facts underlying this case are not in dispute. The Tribes are the beneficial owners of trust lands within the State of Kansas. The United States holds legal title to the lands in trust for the benefit of the Tribes. Each of the Tribes own and operate retail gasoline stations on these lands. The stations are located along or near Kansas state highways. Prior to May 1995, the Kansas Department of Revenue took the position that the motor fuel tax law as written did not permit the State to tax

2

motor fuel distributed on Indian lands. After the Kansas legislature amended the Kansas Motor Fuel Tax Act in 1995, see Kan. Stat. Ann. §§ 79-3401 to 79-3464f (1997), however, the department reversed its position and this litigation ensued.

In their complaint, the Tribes sought declaratory and injunctive relief against the State based upon both federal and state law. The Tribes invoked the district court's jurisdiction under U.S. Const. art. I, § 8, cl. 3 and 28 U.S.C. §§ 1331, 1362, 1367. The Tribes claimed that (1) federal law preempted the motor fuel tax law as applied to the Tribes, (2) the motor fuel tax law as properly construed did not apply to fuel distributed to the Tribes, and (3) imposing the motor fuel tax on the Tribes would irreparably harm their economic viability.

The district court issued both a temporary restraining order, Sac and Fox Nation v. LaFaver, 905 F. Supp. 904 (D. Kan. 1995), and a preliminary injunction, Sac and Fox Nation v. LaFaver, 946 F. Supp. 884 (D. Kan. 1996), against the State. The district court next denied both the State's motion to dismiss the Tribes' complaint based on sovereign immunity, Sac and Fox Nation v. LaFaver, 979 F. Supp. 1350 (D. Kan. 1997), and its motion to reconsider, Sac and Fox Nation v. LaFaver, 993 F. Supp. 1374 (D. Kan. 1998). On cross motions for summary judgment, the court entered judgment for the Tribes and permanently enjoined the State from enforcing its motor fuel tax law against the Tribes. Sac and Fox Nation v. LaFaver, 31 F. Supp. 2d 1298 (D. Kan. 1998).

Addressing a myriad of legal issues, the district court first held the Tribes had standing to pursue their claims against the State. Id. at 1302. Turning to the merits, the court held that (1) tax compacts between the Tribes and State did not prohibit the State from imposing its fuel tax on fuel distributed to the Tribes, id. at 1302-03, (2) the fuel tax exemption for fuel sold or delivered to the United States and its agencies, Kan. Stat. Ann. § 79-3408(d)(2) (1999 Supp.), did not encompass the Tribes, Sac and Fox Nation, 31 F. Supp. 2d at 1303-04,[1] but (3) the fuel tax exemption for fuel exported from the State to territories outside the State did encompass Indian lands:

> The statute [Kan. Stat. Ann. § 79-3408(d)(1) (1999 Supp.)] exempts any fuel transactions where the fuel is exported "to any other state or territory or to any foreign country." From this reading, the court can only conclude that the intent of the Kansas legislature was to exempt any transaction where the fuel was to be sold outside the boundaries of the State of Kansas. As the Act for Admission of Kansas into the Union [Ch. XX, § 1, 12 Stat. 126 (1861)] . . . clearly exclude[s] the Indian reservations from the boundaries of the State of Kansas, it is only reasonable that § 79-3408(d)(1) provides for an exemption to the transactions involved in this case where fuel is sold to tribal retailers on the recognized reservations.

Sac and Fox Nation, 31 F. Supp. 2d at 1304.

As an alternative basis for issuing a permanent injunction against the State, the court relied on Oklahoma Tax Comm'n v. Chickasaw Nation, 515 U.S. 450 (1995), to hold that although the legal incidence of the fuel tax fell on the distributors rather than the

---

[1] On appeal, the Tribes do not challenge the district court's conclusions that (1) their tax compacts with the State of Kansas have expired and are no longer of any legal force, and (2) the fuel tax exemption for fuel sold or delivered to the United States and its agencies does not encompass Indian tribes.

4

Tribes, the balance of tribal and state interests weighed in favor of the Tribes, thus requiring the court to invalidate the tax as applied to the Tribes. Sac and Fox Nation, 31 F. Supp. 2d at 1304-08. The district court subsequently denied the State's motion to alter the judgment, Sac and Fox Nation v. Pierce, 45 F. Supp. 2d 859 (D. Kan. 1999), and the State appealed. Our jurisdiction arises under 28 U.S.C. § 1291. We address each of the State's several challenges to the district court's judgment in turn. We reverse the judgment of the district court and remand for further proceedings.

## II.

As a preliminary matter, we address the district court's power to adjudicate this case on the merits. The State contends the district court had no jurisdiction over this controversy because (1) the doctrine of sovereign immunity bars the Tribes' suit, and (2) the Tribes' have no standing to maintain their suit. The district court's determination of subject matter jurisdiction is a question of law which we review de novo. Rosette Inc. v. United States, 141 F.3d 1394, 1395 (10th Cir. 1998). Applying this standard, we reject the State's jurisdictional contentions, and conclude the district court properly exercised jurisdiction over this cause.

## A.

In the district court, the Tribes alleged jurisdiction under U.S. Const. art. I, § 8, cl. 3 and 28 U.S.C. § 1362, as well as under the general federal question and supplemental jurisdiction statutes, 28 U.S.C. §§ 1331, 1367. The Tribes rely on

5

Article I's Indian Commerce Clause which gives Congress the power "[t]o regulate Commerce . . . with the Indian Tribes." Meanwhile, § 1362 is a specific grant of jurisdiction to the district court in matters involving Indian tribes: "The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe . . . wherein the matter in controversy arises under the Constitution, law, or treaties of the United States." The State asserts that neither of these provisions is sufficient to overcome the State's sovereign immunity under the Eleventh Amendment, U.S. Const. amend. XI.

The Eleventh Amendment, as construed by the Supreme Court, generally proscribes federal jurisdiction over suits against nonconsenting states unless Congress has abrogated the states' sovereign immunity in a clear and unequivocal manner pursuant to a valid exercise of its power. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54-55 (1996) (holding that Congress lacks power under Article I to abrogate a state's sovereign immunity from suits brought by private parties.). In Blatchford v. Native Village of Noatak, 501 U.S. 775 (1991), the Supreme Court rejected the notion that the Eleventh Amendment "only restricts suits by individuals against sovereigns, not by sovereigns against sovereigns." Id. at 780 (emphasis in original). The Court likewise rejected the notion that the states waived their immunity against Indian tribes when they adopted the Constitution: "We have hitherto found a surrender of immunity against particular litigants [inherent in the constitutional compact] in only two contexts: suits by sister States and suits by the United States." Id. at 781-82 (internal citation omitted).

6

Accordingly, the Court held that the Eleventh Amendment barred an Indian tribe's suit under a state revenue sharing plan against an Alaskan state official, despite the tribe's sovereign status. In so holding, the Court also rejected the notion that 28 U.S.C. § 1362 operated as a general waiver of a state's sovereign immunity. Paramount to our analysis, however, was the Court's recognition that in Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463 (1976), a case involving an Indian tribe's access to federal court "for the purpose of obtaining injunctive relief from state taxation," the Court had reached a different conclusion. Blatchford, 501 U.S. at 784.

In Moe, the Court upheld an Indian tribe's right to seek injunctive relief from state taxation in federal court. Moe involved, among other things, an attack on Montana's cigarette sales tax as applied to cigarette sales to both Indians and non-Indians on Indian lands. Before reaching the merits, the Court addressed the district court's jurisdiction to entertain the tribe's suit against a Montana sheriff responsible for enforcing the tax. Moe, 425 U.S. at 470-475. The Court held that § 1362 proscribed application of the Tax Injunction Act, 28 U.S.C. § 1341, to the tribe's suit.[2] The Court first noted that § 1341 did not apply to suits "brought by the United States 'to protect itself and its instrumentalities from unconstitutional state exactions.'" Moe, 425 U.S.

---

[2] The Tax Injunction Act provides that federal "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state." 28 U.S.C. § 1341.

7

at 470 (quoting Department of Employment v. United States, 385 U.S. 355, 358 (1966)).

From this principle, the Court reasoned:

> Looking to the legislative history of § 1362 . . . we find an indication of congressional purpose to open the federal courts to the kind of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought. Section 1362 is characterized by the reporting House Judicial Committee as providing "the means whereby the tribes are assured of the same judicial determination whether the action is brought in their behalf by the Government or by their own attorneys." [H.R. Rep. No. 2040, 89th Cong., 2d Sess., 2-3 (1966)]. While this is hardly an unequivocal statement of intent to allow such litigation to proceed irrespective of other explicit jurisdictional limitations, such as § 1341, it would appear that Congress contemplated that a tribe's access to federal court to litigate a matter arising "under the Constitution, laws, or treaties" would be at least in some respects as broad as that of the United States suing as the tribe's trustee.

Id. at 472-73. See also United States v. Rickert, 188 U.S. 432 (1903) (upholding Government's right to seek injunctive relief against county taxation directed at improvements on and tools used to cultivate Sioux Indian lands).

In Moe, the Court concluded that because § 1341 would not bar the United States from seeking to enjoin enforcement of the state tax law on the tribe's behalf, the tribe itself could maintain its suit against the state. Moe, 425 U.S. at 474-75. The Court emphasized that its decision "'rested upon a broader foundation than the mere holding of a legal title to land in trust, and embraced the recognition of the interest of the United States in securing immunity to the Indians from taxation conflicting with the measures it had adopted for their protection.'" Moe, 425 U.S. at 473 (quoting Heckman v. United States, 224 U.S. 413, 441 (1912)).

8

Moe leads us to conclude that we have jurisdiction under 28 U.S.C. § 1362 to reach the merits of this case. Surely if an Indian tribe may maintain suit on its own behalf in federal court to enjoin collection of a state's cigarette sales tax, it may maintain a similar suit on its own behalf to enjoin collection of a state's motor fuel distribution tax. Neither the Tax Injunction Act nor the Eleventh Amendment bars the Tribes' suit in this case. Undoubtedly after Seminole Tribe, the Eleventh Amendment generally bars an Indian tribe's suit in federal court against a state where the tribe's claim rests solely on Article I's Indian Commerce Clause. As the Supreme Court stated in both Blatchford and Moe, however, an Indian tribe's suit for injunctive relief against state taxation occurring on trust lands is another matter. Blatchford expressly recognized what Moe necessarily inferred from § 1362. Blatchford explained that in Moe, the Court found in § 1362–

> an implication that a tribe's access to federal court to litigate federal-question cases would be at least in some respects as broad as that of the United States suing as the tribe's trustee. The "respect" at issue in Moe was access to federal court for the purpose of obtaining injunctive relief from state taxation.

Blatchford, 501 U.S. at 784 (emphasis in original) (internal citations, quotations, and brackets omitted). Accordingly, we conclude that the Eleventh Amendment does not bar the Tribes' suit against the State to enjoin enforcement of the Kansas

9

motor fuel tax law.[3]

B.

We next turn to the question of the Tribes' standing to maintain their suit against the State. The State argues that because the district court determined the legal incidence of the motor fuel tax fell on the distributors rather than on the tribal retailers, Sac and Fox Nation, 31 F. Supp. 2d at 1304-07, the Tribes lack standing to challenge the motor fuel tax. According to the State, the law does not confer standing upon the Tribes merely because they either must absorb the overhead cost of the fuel distributed to them or pass the cost along to their consumers.

The standing inquiry requires us to consider "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498 (1975). The constitutional standing question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [its] behalf." Id. at 498-99 (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

---

[3] The district court relied on the legal fiction established in Ex Parte Young, 209 U.S. 123 (1908), to overcome the State's claim of sovereign immunity. Sac and Fox Nation, 979 F. Supp. at 1352-54. Under the Ex Parte Young legal fiction, when an official of a state agency is sued in her official capacity for prospective equitable relief, she is generally not regarded as "the state" for purposes of the Eleventh Amendment, and the case may proceed in federal court. See ANR Pipeline Co. v. LaFaver, 150 F.3d 1178, 1188 (10th Cir. 1998). Because we conclude that we have jurisdiction to reach the merits of this case under 28 U.S.C. § 1362, we decline to address the question of Ex Parte Young's application to matters of state taxation affecting Indian tribes.

10

The Supreme Court has identified three constitutional standing requirements. A plaintiff must allege (1) a concrete and particularized actual or imminent injury, (2) which is fairly traceable to defendant's conduct, and (3) which a favorable court decision will redress. Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. City of Jacksonville, 508 U.S. 656, 663-64 (1993).

Additionally, the Supreme Court has identified three prudential standing principles. First, a plaintiff generally must assert its own rights, rather than those belonging to third parties. Warth, 422 U.S. at 499. Second, "a generalized grievance" shared by a large class of citizens normally does not warrant a federal court's exercise of jurisdiction. Id.[4] Third, the interests which a plaintiff seeks to protect must "arguably [be] within the zone of interests to be protected by the statute or constitutional guarantee." Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).

We have little difficulty concluding that the Tribes in this case have constitutional standing to maintain their suit against the State. First, the Tribes have alleged particularized imminent economic injury if the State imposes its motor fuel tax on fuel distributed to the Tribes' retail stations. The Tribes' uncontroverted

---

[4] In Warth, 422 U.S. at 499, the Supreme Court indicated that the standing principle against generalized grievances of citizen groups, which implicitly includes taxpayer groups, was prudential rather than constitutional. In Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-62 (1992), however, the Court treated the bar on such lawsuits as constitutional.

11

affidavits, albeit conclusory, support their allegations of injury. See Warth, 422 U.S. at 501 (plaintiff may submit affidavits to particularize allegations of fact in support of its standing). Second, the Tribes' alleged injury is directly traceable to the State's desire to tax these distributions. Finally, a decision in favor of the Tribes enjoining the State from enforcing the motor fuel tax against their distributors would likely redress the Tribes' alleged injury since most assuredly the distributors responsible for remitting the tax pass the cost of the tax along to the Tribes. See Kan. Stat. Ann. § 79-3409 (1999 Supp.) (expressly permitting the distributor to include the cost of the motor fuel tax in its selling price).

We likewise conclude that prudential standing principles do not bar our exercise of jurisdiction in this case. Certainly the Tribes assert their own rights under both federal and state law to be free from the cost of the motor fuel tax, though any decision in their favor undoubtedly will benefit their distributors and consumers as well. Thus, we do not agree with the State's argument that because the district court determined the legal incidence of the motor fuel tax falls upon the distributors rather than the retailers, see id. § 79-3408(c) (expressly stating that the incidence of the motor fuel tax is on the distributor), the Tribes' claims amount to little more than a "generalized grievance" shared by all retailers to whom the distributors pass the cost of the tax.

In resolving challenges to state taxation affecting tribal businesses on Indian lands, the Supreme Court has addressed the legal incidence of a tax as a question

intertwined with the merits of the case. E.g., California State Bd. of Equalization v. Chemehuevi Indian Tribe, 474 U.S. 9, 10-12 (1985) (per curiam) (holding that because the legal incidence of the state's cigarette sales tax fell on non-Indian consumers, the state could require the tribe to collect the tax on the state's behalf); Moe, 425 U.S. at 481-83 (same). In Chickasaw Nation, 515 U.S. at 459, the Court recognized that where the legal incidence of a tax falls on non-Indians, the tribe may still be entitled to injunctive relief if federal law preempts state law or the balance of federal, state, and tribal interests favors the tribe. Chickasaw Nation's balancing requirement implicitly embraces our conclusion that regardless of where the legal incidence of the motor fuel tax falls, the Tribes at the very least have a particularized claim of injury, rather than a "generalized grievance," with respect to the tax sufficient to confer standing upon them. See Moe 425 U.S. at 468 n.7.

Finally, the alleged economic interests of the Tribes in this case are arguably within the zone of interests which federal law seeks to protect. Consistent with the long standing recognition of Indian tribes as "domestic dependent nations," Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831), the federal government has sought to protect tribal self-government from state interference, including state taxation. McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 170-71 (1973). See also 25 U.S.C. §1322(b) (refusing to extend state's general civil jurisdiction over Indians to matters of taxation). The Supreme Court has repeatedly recognized the United States' interest in securing immunity

to the Indians from state taxation which threatens Indian tribes' unique status. Moe, 425

U.S. at 473. Absent congressional consent through statute or treaty, states have no power

to directly tax tribal commerce on tribal lands. Mescalero Apache Tribe v. Jones,

411 U.S. 145, 148 (1973).[5] See also California v. Cabazon Band of Mission Indians,

480 U.S. 202, 214-15 & n.17 (1987) (noting per se rule precluding state jurisdiction

absent congressional consent over tribes and tribal members in the "special area of

state taxation"). The Indian Commerce Clause gives Congress the power to regulate

commerce with Indian tribes. McClanahan, 411 U.S. at 172 n. 7. Surely

the economic interests which the Tribes seek to protect by enjoining application of the

State's motor fuel tax are "arguably within the zone of interests to be protected by th[at] .

. . constitutional guarantee." Camp, 397 U.S. at 153 (emphasis added). Whether

the Kansas motor fuel tax as applied interferes with that guarantee is a matter for

---

[5] In Rice v. Rehner, 463 U.S. 713, 713, 718-19 (1983), the Court explained:

> Congressional authority and the semi-independent position of Indian tribes
> are two independent but related barriers to the assertion of state regulatory
> authority over tribal reservations and members. Although the right of tribal
> self-government is ultimately dependent on and subject to the broad power
> of Congress, we still employ the tradition of Indian sovereignty as a
> backdrop against which the applicable treaties and federal statutes
> must be read in our pre-emption analysis.

(internal quotations, citations, brackets and elipses omitted). Of course, in addition to
treaties and statutes, stare decisis requires us to look to Supreme Court and Tenth Circuit
decisions to define the limits of state jurisdiction in matters of taxation affecting Indian
tribes.

legitimate judicial inquiry.  To that question, we now turn.

III.

A.

At the outset, the State argues that Congress, through passage of the

Hayden-Cartwright Act, 4 U.S.C. § 104, has consented to the state's taxing power

in this instance.  According to the State, § 104 cedes taxing jurisdiction to the states

on motor fuel distributed on Indian lands.  Section 104(a) provides in relevant part:

> All taxes levied by any State . . . upon, with respect to, or measured by, sales, purchases, storage, or use of gasoline or other motor vehicle fuels may be levied, in the same manner and to the same extent, with respect to such fuels when sold by or through post exchanges, ship stores, ship service stores, commissaries, filling stations, licensed traders, and other similar agencies, located on United States military or other reservations, when such fuels are not for the exclusive use of the United States.  Such taxes, so levied, shall be paid to the proper taxing authorities of the State . . . within whose borders the reservation affected may be located.

Id. § 104(a).  The State construes the phrase "located on United States military or other

reservations" as including Indian lands.  See State v. Keeley, 126 F.2d 863, 864-65 (8th

Cir. 1942) (discussing the history surrounding the enactment of § 104).  We decline to

address the State's § 104(a) argument, however, because the State did not properly

present the question of § 104(a)'s applicability vis-a-vis the Kansas motor fuel tax

to the district court, and thus the district court had no opportunity to consider or

decide the question.

A federal appeals court generally will not consider an issue raised but not

15

argued in the district court. Rademacher v. Colorado Assoc. of Soil Conserv. Dist. Medical Benefit Plan, 11 F.3d 1567, 1571 (10th Cir. 1993). "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals." Singleton v. Wulff, 428 U.S. 106, 121 (1976). Where the question is one of law, we may relax the general rule if the proper resolution is beyond doubt or injustice might otherwise result. Id. Accord Cavic v. Pioneer Astro Indus., Inc., 825 F.2d 1421, 1425 (10th Cir. 1987). But we need not decide an issue otherwise waived simply because it may be "outcome determinative." First Alabama Bank v. First State Ins. Co., 899 F.2d 1045, 1060 n. 8 (11th Cir. 1990) (appeals court will decide waived issues "only in instances where strict application of the rule would result in patently unjust results").

In this case, the State raised the § 104(a) defense in its answer to the Tribes' complaint, both which were filed in 1995. Never again did the State raise the issue with the district court although it had ample opportunity to do so by way of both its motion to dismiss and its motion for summary judgment, as well as its subsequent motions to reconsider. See Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986) ("A contention included in an answer, but not pressed before the district court, may not be presented on appeal as ground for reversal.").[6] Suffice it to say that we are loath to

---

[6] The State's sole reference to § 104 in the district court read as follows:

(continued...)

16

resolve the § 104 issue for the first time on appeal. Neither the Supreme Court nor any of the circuit courts of appeals, nor any court as far as we can discern, has addressed the difficult question of whether Congress intended 4 U.S.C. § 104(a) to encompass Indian lands. This being so, injustice would more likely result than not by us deciding the issue without the Tribes having an opportunity first to be heard on the merits in the district court. See Singleton, 428 U.S. at 121.

B.

The district court relied on a combination of federal and state law to justify its issuance of a permanent injunction against the State. First, the court concluded that under the Act for Admission of Kansas into the Union, Ch. XX, § 1, 12 Stat. 126 (1861), Indian lands were not within the boundaries of the State of Kansas. The Act, the court reasoned, "make[s] it very clear . . . that the Indian reservations are not to be considered part of the State of Kansas in any way." Sac and Fox Nation, 31 F. Supp. 2d at 1304. The court then concluded that because Indian lands were not within the State, the distributors' motor fuel tax exemption for fuel exported from Kansas "to any other state

---

[6](...continued)
    If this court determines that the incidence of motor fuel tax under Kansas law is at the retail level and such incidence is determined by this court to fall on plaintiffs, the defendant affirmatively asserts that he is authorized by federal law, 4 U.S.C. § 104, to impose Kansas motor fuel tax on plaintiffs.

Aplt's App. at 97 (emphasis added). Presumably because the district court held the legal incidence of the motor fuel tax fell on the distributors rather than on the Tribes, the State felt no need to press its "conditional" § 104 defense.

or territory," Kan. Stat. Ann. § 79-3408(d)(1) (1999 Supp.), applied to fuel distributed on Indian lands. Sac and Fox Nation, 31 F. Supp. 2d at 1304. Thus, the district court enjoined the State from taxing such distributions. We review the district court's construction of federal and state law de novo. United States v. LaHue, 170 F.3d 1026, 1028 (10th Cir. 1999). Applying this standard, we believe the district court misconstrued the 1861 Act for Admission, and thus misapplied the statutory exemption to the Kansas motor fuel tax.

The 1861 Act for Admission of Kansas into the Union provides–

[N]othing contained in the said constitution respecting the boundary of said State shall be construed . . . to include any territory which, by treaty with such Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any State or Territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the State of Kansas.

12 Stat. 127 (emphasis added).[7] To our knowledge, the only federal decision construing the applicable provision of the 1861 Act is United States v. Ward, 28 F. Cas. 397 (C.C.D. Kan. 1863) (No. 16,639). Ward involved the question of the United States' criminal jurisdiction over the murder trial of a non-Indian defendant whose victim was also non-Indian. The murder occurred on lands of the Kansas Tribe of Indians within the external

---

[7] The Organic Act of 1854, Ch. LIX, § 19, 10 Stat. 284, which established the Territory of Kansas, contains nearly identical language. We need not consider in detail the Organic Act because our construction of the Act for Admission controls our construction of the Organic Act. See United States v. Ward, 28 F. Cas. 397, 398 (C.C.D. Kan. 1863) (No. 16,639).

boundaries of the State of Kansas. Holding the State of Kansas, not the United States, had jurisdiction over the matter, Supreme Court Justice Miller, riding circuit, reasoned that under the Act, all territory not previously exempted from the boundaries of the State of Kansas by treaty between the United States and an Indian tribe "was included within the state, within its jurisdiction and within its territory; and this irrevocably, unqualifiedly, and exclusively." Id. at 399.

We agree with Justice Miller's able construction of the 1861 Act for it is consistent with the Act's plain language. The Act for Admission excludes from the boundaries of the State of Kansas only those lands which Indian tribes reserved unto themselves "by treaty" with the United States. The Tribes fail to identify any language in any of the treaties provided us which we might construe as excluding their lands from the boundaries of the State. See Aplt's App. at 176-200. The Tribes argue, however, that the question is not whether the Indian lands at issue in this case are independent territories separate from the State for all purposes. Instead, the contend "[t]he question is whether Indian country is excluded from the legal territory of Kansas for purposes of motor fuel taxation." Aples' Br. at 26 (emphasis in original).

In a decision apparently overlooked by both the State and the Tribes, the Kansas Supreme Court resolved this very question in Kaul v. State Dept. of Revenue, 970 P.2d 60 (Kan. 1998), cert. denied, 120 S. Ct. 46 (1999). In Kaul, fuel retailers with businesses located on Indian lands claimed an exemption from the motor fuel tax under

19

§ 79-3408(d)(1), which provides: "No tax is hereby imposed upon or with respect to the . . . sale or delivery of motor-vehicle fuel . . . for export from the state of Kansas to any other state or territory . . . ." Kan. Stat. Ann. § 79-3408(d)(1) (1999 Supp.). The retailers made precisely the same argument as do the Tribes in this case. The Kansas Supreme Court rejected the argument, holding that "the exemption from taxation provided by K.S.A. § 79-3408(d)(1) did not apply to the retailers because Indian reservations within the boundaries of the State are not included as territories outside the boundaries of Kansas." Kaul, 970 P.2d at 66-67. Of course, absent some conflict with federal law or overriding federal interest, the Kansas Supreme Court's interpretation of § 79-3408(d)(1) is binding on us. See Wainwright v. Goode, 464 U.S. 78, 84 (1983). We conclude that neither the Act for Admission of Kansas into the Union, nor the statutory exemption contained in § 79-3408(d)(1), lends any support to the Tribes' challenge to the Kansas motor fuel tax law.

## C.

As an alternative basis for issuing a permanent injunction against the State, the district court applied the balancing of interests test endorsed in Chickasaw Nation, 515 U.S. at 459: "[I]f the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy." Before balancing the parties' respective interest, however, the district court concluded that the

legal incidence of the Kansas motor fuel tax fell on the distributors rather than on the Tribes. Sac and Fox Nation, 31 F. Supp. 2d at 1304-07. As the district court recognized, if the legal incidence of the fuel tax falls on the Tribes for sales made on Indian lands, the fuel tax is unenforceable absent congressional consent:

> [W]hen a State attempts to levy a tax directly on an Indian tribe or its members inside Indian country, rather than on non-Indians, we have employed, instead of a balancing inquiry, "a more categorical approach: Absent cession of jurisdiction or other federal statutes permitting it, we have held a State is without power to tax reservation lands and reservation Indians."

Chickasaw Nation, 515 U.S. at 458 (internal brackets and quotations omitted) (quoting County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251, 258 (1992)). See also Cabazon Band, 480 U.S. at 215 n.17 (noting that where the legal incidence of a tax falls upon the tribe or its members, rebalancing the state and tribal interests in every case is unnecessary because "the federal tradition of Indian immunity from state taxation is very strong and the state interest in taxation is correspondingly weak"). Accordingly, we now turn to the question of who bears the motor fuel tax law's legal incidence.

1.

For our purposes, the question of where the legal incidence of the Kansas motor fuel tax rests is one of federal law. See United States v. Mississippi Tax Comm'n, 421 U.S. 599, 609 n. 7 (1975); Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 121 -122 (1954). Otherwise, "a state court might interpret its tax statute so as to throw tax

21

liability where it chose, even though it arbitrarily eliminated an exempt sovereign."

Kern-Limerick, 347 U.S. at 121.  But see Mescalero Apache Tribe v. O'Cheskey,

625, F.2d 967. 968-69 (10th Cir. 1980) (en banc) (citing Kern-Limerick for the

proposition that in federal court, "[t]he holding of a state court as to the incidence of

a [state] tax is generally determinative" of the issue) (emphasis added).  Federal courts

are duty bound to decide for themselves "facts and constructions" upon which federal

issues turn.  Kern-Limerick, 347 U.S. at 121.  To determine whether the motor fuel

tax transgresses federal law, we first "look through form and behind labels to [the]

substance" of state law.  City of Detroit v. Murray Corp., 355 U.S. 489, 492 (1958).

Mindful of how the tax operates under state law, we then apply federal standards

to determine where the legal incidence of the tax rests.  See Kerr-Limerick,

347 U.S. at 121-22.

According to the Supreme Court, the legal incidence of a tax does not always

fall upon the entity legally liable for payment of the tax.  Mississippi Tax Comm'n, 421

U.S. at 607-10.  Rather, the legal incidence of a tax falls upon the entity or individual

necessarily responsible for paying the tax under the taxing statutes.  Id.  In the absence

of dispositive language indicating upon whom the legal incidence of a tax rests, "the

question is one of 'fair interpretation of the taxing statute as written and applied.'"

Chickasaw Nation, 515 U.S. at 461 (quoting Chemehuevi Tribe, 474 U.S. at 11)).

Applying these principles, we agree with the district court that the legal incidence of

22

the tax law as presently written falls on the fuel distributors rather than on the Tribes.[8]

But see Kaul, 970 P.2d 67-69 (suggesting that the legal incidence of the Kansas motor

fuel tax fell on the retailers where the distributors itemized the tax on retailers' bills as

money due the State).

The Kansas Motor Fuel Tax Act provides that "[a] tax per gallon or fraction

thereof, at a rate computed as prescribed . . . is hereby imposed on the use, sale or

delivery of all motor vehicle fuels . . . which are used, sold or delivered in this

state for any purpose whatsoever." Kan. Stat. Ann. § 79-3408(a) (1999 Supp.).

Section 79-3408c appears to place a fuel tax upon both licensed distributors and retailers:

"A tax is hereby imposed on the use, sale or delivery of all motor vehicle fuel . . . by any

licensed distributor or licensed retailer . . . ." Id. § 79-3408c(a). Notably, however,

subsection (c) of § 79-3408c excludes the Tribes from the retail tax: "The provisions

of this section shall not apply to any licensed retailer who is native American whose

licensed place of business or businesses are located on such retailer's reservation nor to

---

[8] The State makes no counterclaim against the Tribes for taxes past due under the Kansas Motor Fuel Tax Act, nor could it because the legal incidence, and thus liability for payment of the tax, falls on the distributors. Even if the legal incidence of the tax fell on the Tribes, no such action would lie because the doctrine of sovereign immunity bars the State from seeking recourse against the Tribes. See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509-14 (1991) (absent clear waiver or congressional authorization, the sovereign immunity doctrine bars suits against Indian tribes). Accordingly, we express no opinion on the legal incidence of the fuel tax prior to the 1998 amendments to the Act. See Kan. Stat. Ann. §§ 79-3401 to 79-3464f (1997).

23

any native American tribes having licensed places of business or businesses located on such tribe's reservation." Id. § 79-3408c(c). Perhaps most importantly, subsection 79-3408(b) provides that "the incidence of this [motor fuel] tax is imposed on the distributor of the first receipt of the motor fuel and such taxes shall be paid but once." Id. § 79-3408(b).

Despite their lack of legal liability for payment of the motor fuel tax, the Tribes argue the legal incidence of the tax falls upon them because the distributors simply pass on the cost of the tax to the Tribes in the wholesale price. To be sure, the motor fuel tax law presumes distributors will include the cost of the tax in their wholesale price to the Tribes. Section 79-3409 provides: "Every distributor paying such tax or being liable for the payment shall be entitled to charge and collect an amount, including the cost of doing business that could include such tax on motor vehicle-fuels . . . sold or delivered by such distributor, as a part of the selling price." Id. § 79-3409 (emphasis added). But § 79-3409 also presumes that retailers will pass the cost of the tax along to their consumers: "When the price of motor vehicle fuels or special fuels . . . posted on a price sign does not include the state and federal tax which such retail dealer's distributor paid or for which the distributor was liable, the total of the taxes must be shown in numbers the same size as the price of the motor fuel." Id.

Significantly, the law's pass-through provision about which the Tribes complain is permissive rather than mandatory. Compare Kern-Limerick, 347 U.S. at 111 (holding

24

unconstitutional, as applied to sales to the United States, a state sales tax statute which purported to tax the seller, but provided that the seller "shall collect the tax levied hereby from the purchaser"). Section 79-3409 does not require distributors to pass the cost of the motor fuel tax to retailers; it simply permits them to do so by stating the obvious. Even in the absence of § 79-3409, distributors could (and most assuredly would) pass along the cost of the fuel tax to retailers; but it is not necessary that they do so. As we said of an Oklahoma beer tax imposed on wholesalers who sold beer to tribal retailers on tribal lands:

> Even if it were true that the economic burden of the tax falls on the Tribe because the wholesalers simply incorporate the tax into the wholesale cost, this would not be determinative of the question of the legal incidence of the tax. Just as a nondiscriminatory tax imposed on a private entity that does business with the United States and that passes the cost of that tax on to the United States does not violate federal sovereign immunity, so a nondiscriminatory tax imposed on non-exempt private entities that do business with Indian tribes and that pass the cost of those taxes on to the tribes does not violate tribal sovereign immunity.

Chickasaw Nation v. Oklahoma Tax Comm'n, 31 F.3d 964, 970 (10th Cir. 1994) (emphasis added) (internal citations omitted), aff'd in part, rev'd in part on other grounds, 515 U.S. 450 (1995).

The Tribes ask us to substitute economic assumptions for the language of the Kansas statutes. But "[t]he question of who bears the ultimate economic burden of the tax is distinct from the question of on whom the tax has been imposed." Id. at 972. "[F]ocus on a tax's legal incidence accommodates the reality that tax

25

administration requires predictability." Chickasaw Nation, 515 U.S. at 459-60.

"[I]f a State is unable to enforce a tax because the legal incidence of the impost is on Indians or Indian tribes, the State generally is free to amend its law to shift the tax's legal incidence." Id. at 460.

Certainly, if the fuel tax law required distributors to include the amount of the fuel tax in their wholesale price, we would be justified in concluding that the legal incidence of the tax falls upon the Tribes. See Chickasaw Nation, 31 F.3d at 971.[9] But the law does not require distributors to charge retailers the cost of the tax. Kansas law expressly states that the legal incidence of the motor fuel tax is upon the distributors and they are responsible for remitting the tax. Kan. Stat Ann. § 79-3408(c) (1999 Supp.). See Moe, 425 U.S. at 482. Moreover, the law expressly exempts the Tribes from the requirements of any retail fuel tax. Id. § 79-3408c(c). We conclude a fair reading of the motor fuel tax law supports the district court's determination that as applied in this case the legal incidence of the motor fuel tax falls upon the distributors.

2.

In the alternative, the Tribes argue that even if the legal incidence of Kansas'

---

[9] In Chickasaw Nation, we held that the legal incidence of an Oklahoma motor fuel tax fell on the tribal retailers because the governing statutes indicated that the distributors remitted the fuel tax "on behalf of" licensed retailers. 31 F.3d at 971-72. The Supreme Court agreed with our construction of the Oklahoma statutes. Chickasaw Nation, 515 U.S. at 461-62. Contrary to the Tribes' assertions, we cannot reasonably construe the Kansas statutes as requiring distributors to collect and remit the motor fuel tax "on behalf of" the tribal retailers.

motor fuel tax falls upon the distributors, the Indian Trader Statutes, 25 U.S.C. §§ 261-264, constitute a comprehensive federal statutory scheme which preempts the State's fuel tax law. See Chickasaw Nation, 515 U.S. at 459 (if the legal incidence of a tax falls on non-Indians, a state may assess the tax if the balance of interests weighs in favor of the state "and federal law is not to the contrary") (emphasis added). Although the Tribes raised and argued the trader statutes' applicability in the district court, the court appears to have referred to the issue only cursorily. Sac and Fox Nation, 946 F. Supp. at 889 (order granting preliminary injunction). While the question of the trader statutes' applicability is not wholly separate from the balancing inquiry, see Department of Taxation and Finance v. Milhelm Attea & Bros., 512 U.S. 61, 73 (1994), we address this issue before we proceed to our discussion of the balancing of interests.[10] We review federal statutes de novo. Ben Ezra, Weinstein, and Co. v. America Online, Inc., 206 F.3d 980, 984 (10th Cir. 2000). We conclude that the Kansas motor fuel tax law

---

[10] In Milhem Attea, the Court explained:

Resolution of conflicts of this kind [a challenge to state regulations allegedly preempted by the trader statutes] does not depend on rigid rules or on mechanical or absolute conceptions of state or tribal sovereignty, but instead on a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

512 U.S. at 73 (internal brackets and quotations omitted).

is not inconsistent with the Indian Trader Statutes.[11]

Consistent with its power under the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, Congress enacted the Indian Trader Statutes "to prevent fraud and other abuses by persons trading with Indians." Milhelm Attea, 512 U.S. at 70. The statutes give the Commissioner of Indian Affairs seemingly broad power to regulate trade with Indian tribes. Specifically, 25 U.S.C. § 261 states:

> The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules

---

[11] As a preliminary matter, we note that the actual Indian traders subject to the motor fuel tax, i.e., the wholesale fuel distributors, are not parties to this suit. Thus, the question of their joinder necessarily arises, see Fed. R. Civ. P. 19, and we address it sua sponte. While it might have been preferable to join the distributors as parties in the district court (at least for purposes of adjudicating the question of the traders statutes' applicability), neither the State nor the Tribes ever raised that possibility over the course of four years of district court litigation. Nor did the distributors, who surely are apprised of this litigation, seek to intervene. While the distributors appear to be necessary parties under Rule 19(a), they technically are not indispensable parties under Rule 19(b) because their joinder appears feasible, that is to say the distributors may be joined without destroying our subject matter jurisdiction over this cause. See Provident Tradesman Bank v. Patterson, 390 U.S. 102, 118-119 & n.15 (1968).

Nevertheless, at this late date we are unwilling to require the distributors' joinder because pragmatic considerations dictate otherwise. See id. at 106-107. First, the State is foreclosed from asserting the non-joinder issue for the first time on appeal and cannot now be heard to complain of possible relitigation with the distributors or possible inconsistent obligations. See id. at 110; Martin v. Wilks, 490 U.S. 755, 765 (1989) (burden is on the parties to a lawsuit to join necessary additional parties). Second, any judgment we render regarding the trading statutes is nonbinding as to the distributors in the context of res judicata. See Provident Tradesman, 390 U.S. at 110. Third, the preference for joinder in the district court on efficiency grounds has all but disappeared at this late date. See id. at 116. We simply find no compelling reason to set aside the district court's judgment in this case on the basis of the distributors' non-joinder "just because [the judgment] did not theoretically settle the whole controversy." Id.

28

and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.

In Warren Trading Post v. Arizona Tax Comm'n, 380 U.S. 685 (1965), the Court interpreted the trader statutes to bar state taxation of federally licensed retail Indian traders "on their sales to reservation Indians on a reservation." Id. at 690 (emphasis added). See also Central Machinery Co. v. Arizona Tax Comm'n, 448 U.S. 160, 161-66 (1980) (barring the state from taxing unlicensed retailer's sale of farm machinery to the tribe on its reservation). Subsequently, in White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980), the Court held that a comprehensive federal regulatory scheme (unrelated to the trader statutes) governing the harvest of Indian timber preempted Arizona's "use fuel" tax law as applied to a logging contractor operating exclusively on federal and tribal roads within the reservation. Id. at 145-53. Balancing the parties' respective interests, the Court concluded:

> The roads at issue have been built, maintained, and policed exclusively by the Federal Government, the Tribe, and its contractors. We do not believe that [the State's] generalized interest in raising revenue is in this context sufficient to permit its proposed intrusion into the federal regulatory scheme with respect to the harvesting and sale of tribal timber.

Id. at 150.

More recently, in Milhelm Attea, the Court narrowed its interpretation of the trader statutes. In that case, the Court upheld a state regulatory scheme that imposed recordkeeping requirements and quantity limitations on cigarette wholesalers who

29

sold untaxed cigarettes to reservation Indians.  The Court relied on its decisions in

Moe, 425 U.S. at 463, and Washington v. Confederated Tribes of the Colville Indian

Reservation, 447 U.S. 134 (1980), to reject "the submission that 25 U.S.C. § 261 bars any

and all state-imposed burdens on Indian traders."  Milhelm Attea, 512 U.S. at 74. In Moe,

425 U.S. at 481-83, the Court upheld Montana's requirement that tribal retailers collect

a cigarette sales tax validly imposed on non-Indian consumers.  In Colville, 447 U.S.

at 150-161, the Court upheld the State of Washington's similar but more detailed

tobacco sales tax against a tribal challenge.  From these decisions, the Court reasoned that

"[i]t would be anomalous to hold that a State could impose tax collection and

bookkeeping burdens on reservation retailers who are themselves enrolled tribal

members, including stores operated by the tribes themselves, but that similar burdens

could not be imposed on wholesalers who often . . . are not."  Milhelm Attea, 512 U.S.

at 74.[12]

_____

[12]  In Oklahoma Tax Comm'n v. Citizen Band Potawaatomi Indian Tribe, 498 U.S. 505 (1991), the Court held that sovereign immunity barred the State of Oklahoma's suit against a tribe to recover cigarette taxes owed for sales to non-Indians at the tribe's convenience store located on the reservation.  In addressing alternative remedies for the State, the Court stated:

> [U]nder today's decision, States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, Colville, supra, at 161-162, or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores, City Vending of Muskogee, Inc. v. Oklahoma Tax Comm'n, 898 F.2d 122 (CA10 1990).

(continued...)

Our en banc decision in O'Cheskey, 625 F.2d at 967, decided after Warren Trading and Central Machinery, is consistent with the Supreme Court's narrowing of the Indian Trader Statutes in Milhelm Attea.  In O'Cheskey, the State of New Mexico imposed its gross receipts tax on contractors who had done construction work for the Mescalero Apache Tribe on reservation lands.  We upheld the tax on the contractors despite the presence of an indemnity agreement under which the tribe agreed to indemnify the contractors for the tax.  O'Cheskey, 625 F.2d at 969.  Rejecting the tribe's argument that the Indian Trader Statutes preempted the state tax, id. at 990-91, we noted that nothing in the record indicated the contractors performed all their work on the reservation.  Id. at 968.  We reasoned that the legal incidence of the tax was on the contractors, and concluded:

> An indirect burden obviously is initially on the one for whom the services are performed–thus on the Tribe or the Government.  However, it is equally apparent that this indirect burden is again passed on to the users of the resort and again by them.  The tax becomes dispersed.  There is no way of telling where the ultimate economic burden falls.  This is the reason why the initial incidence of the tax must be the determinative factor.  It is the only significant matter for our consideration.

O'Cheskey, 625 F.3d at 970.

Unlike Warren Trading and its progeny, the Kansas motor fuel tax law does not impose a tax upon retail traders for trading with Indians.  Milhelm Attea, 512 U.S.

---

[12](...continued)
Citizen Band, 498 U.S. at 514 (emphasis added).

at 74.  Unlike White Mountain Apache Tribe, no comprehensive federal regulatory scheme governs the wholesale distribution of motor fuel to Indian tribes.  Rather, the Kansas motor fuel tax law imposes a non-discriminatory tax on all wholesale fuel distributors for fuel distributions to retailers within the State of Kansas–Indian or otherwise.  Nothing in the record indicates the Tribes' distributors distribute all their fuel, or even a significant portion of it, to the Tribes.  See O'Cheskey, 625 F.2d at 968.  Thus, the threat of the distributors perpetrating fraud or abuse upon the Tribes appears negligible.  See Milhelm Attea, 512 U.S. at 70.  Based upon the foregoing authorities, we conclude that the Indian Trader Statutes do not so pervade the field that they preempt the Kansas motor fuel tax, the legal incidence of which falls upon the distributors and which imposes only an indirect burden on the Tribes.  The only remaining question in this case then is whether the indirect economic burden of the motor fuel tax constitutes such an interference with the Tribes' internal affairs as to be unlawful under Chickasaw Nation's balancing of interests test.

3.

The district court concluded that the balance of tribal and state interests weighed in favor of the Tribes because (1) the State "would clearly not suffer a great deal of harm if it were enjoined from collecting the tax" on fuel distributed to the tribal retailers, but (2) if imposed, the tax "will have a real and direct impact on the tribes' incomes."  Sac and Fox Nation, 31 F. Supp. 2d at 1307.  Accordingly, the court granted the Tribes' motion

for summary judgment and invalidated the motor fuel tax "as it relates to transactions involving tribal retailers." Id. at 1308. We review the grant of summary judgment de novo. Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000). We conclude the district court overlooked the dictates of Supreme Court precedent and thus failed to adequately develop the factual record before balancing the parties' respective interests.

The Tribes' primary argument in this case is economic. See Aples' App. at 20-49 (affidavits of tribal members). The Tribes assert that the motor fuel tax jeopardizes their retail fuel sales and other revenues generated by those sales at their convenience stores located on tribal lands which support essential tribal services to their members. Both the Sac and Fox and Kickapoo Tribes also impose a tribal tax on their retail sale of fuel, generating still further revenues. According to the Tribes, if the State is allowed to tax the Tribes' fuel distributors, the wholesale cost of fuel to the Tribes will necessarily increase and the revenues from their retail stores will correspondingly decrease, interfering with their sovereign right to self-government.

This is largely the same argument the Supreme Court addressed and rejected in Colville, 447 U.S. at 154-59, where the State of Washington sought to impose a cigarette sales tax on on-reservation purchases by nonmembers of the Tribes. In Colville, the Court phrased the issue as "whether an Indian tribe ousts a State from any power to tax on-reservation purchases by nonmembers of the tribe by imposing its own tax on the transactions or by otherwise earning revenues from the tribal business."

33

<u>Colville</u>, 447 U.S. at 138.  The Court phrased the Tribes' argument as follows:

> If the State is permitted to impose its taxes, the Tribes will no longer
> enjoy any competitive advantage vis-a-vis businesses in surrounding areas.
> Indeed, because the Tribes themselves impose a tax on the transaction, if
> the state tax is also collected the price charged will necessarily be higher
> and the Tribes will be placed at a competitive <u>disadvantage</u> as compared to
> businesses elsewhere.  Tribal smokeshops will lose a large percentage of
> their cigarette sales and the Tribes will forfeit substantial revenues. Because
> of this economic impact, it is argued, the state taxes are (1) pre-empted by
> federal statutes regulating Indian affairs; (2) inconsistent with the principle
> of tribal self-government; and (3) invalid under "negative implications of
> the Indian Commerce Clause.

<u>Id.</u> at 154 (emphasis in original).  The Court was unpersuaded:

> It is painfully apparent that the value marketed by the smokeshops to
> persons coming from outside is not generated on the reservations by
> activities in which the tribes have a significant interest.  What the
> smokeshops offer these customers, and what is not available elsewhere,
> is solely an exemption from state taxation. The Tribes assert the power to
> create such exemptions by imposing their own taxes or otherwise earning
> revenues by participating in the reservation enterprises.  If this assertion
> were accepted, the Tribes could impose a nominal tax and open chains of
> discount stores at reservations borders, selling goods of all descriptions at
> deep discounts and drawing customers from surrounding areas.  We do
> not believe that principles of federal Indian law, whether stated in terms of
> pre-emption, tribal self-government, or otherwise, authorize Indian tribes
> thus to market an exemption from state taxation to persons who would
> normally do their business elsewhere.

<u>Id.</u> at 155.

We are well aware that the tax at issue in <u>Colville</u> was a sales tax imposed down stream on purchases made by non-tribal consumers only.  Because the legal incidence of the tax in <u>Colville</u> fell on the purchaser, the state had no power to tax tribal members making purchases on the reservation.  <u>See</u> <u>Chickasaw Nation</u>, 515 U.S. at 453.  In our

34

case, the legal incidence of the motor fuel tax is imposed up stream on the wholesale distributor and no exemption is allowed for retail fuel sales to tribal members.[13] Important similarities, however, also exist between Colville and this case–(1) a tax the legal incidence of which falls on non-Indians and (2) tribal complaints based on the realities of the marketplace. In both cases, the ultimate economic burden of the tax most assuredly falls on the consumer.

We acknowledge that Kansas' motor fuel tax law as presently applied might sweep too broadly. In other words, if a substantial portion of the Tribes' retail fuel sales are to tribal members, the Tribes' argument that the indirect burden of the fuel tax improperly interferes with their internal affairs would not be without force. Based on the record before us, however, we are unable to discern what portion of tribal fuel sales are to tribal members as opposed to consumers traveling from outside Indian land.[14] Compare

---

[13] A prior version of the motor fuel tax law exempted from the tax–

> The sale or delivery of motor-vehicle fuel . . . to the United States of America and such of its agencies as are not or hereafter exempt by law from liability to state taxation, except that this exemption shall not be allowed if the sale or delivery of motor-vehicle fuel . . . is to a retail dealer located on an Indian reservation in the state and such motor-vehicle fuel . . . is sold or delivered to a nonmember of such reservation.

Kan. Stat. Ann. § 79-3408g(d)(2) (1997) (repealed).

[14] In his affidavit, Corbin Shuckahosse, Chairperson of the Sac and Fox Nation, states:

> [T]he pricing of the [Tribe's] fuel draws customers into the Trad'N Post,

(continued...)

<u>Colville</u>, 447 U.S. at 145 (noting that Indian tobacco dealers made a "large majority" of their reservation sales to non-Indians seeking to take advantage of the claimed tribal exemption from the state's cigarette sales tax).

While we are not unsympathetic to the Tribes' quandary, the Supreme Court has never "gone so far as to grant tribal enterprises selling goods to nonmembers an artificial competitive advantage over all other businesses." <u>Colville</u>, 447 U.S. at 155. In fact, a tax on non-Indians "may be valid even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians." <u>Id.</u> at 151 "[T]he Tribes have no vested right to a certain volume of sales to non-Indians, or indeed to any such sales at all." <u>Id.</u> at 151 n.27.

To be sure, the Tribes have an interest in raising revenues to support essential tribal services to benefit their members. "That interest is strongest when the revenues

---

[14](...continued)
as the sale of other miscellaneous items at the Trad'N Post . . . is also attributable to the fuel sales. Without the draw of the lost-cost fuel, customers would no longer bring their business to the Trad'N Post, and the additional revenue would be lost to the Nation.

Aples' App. at 21. Similarly, Nancy Bear, Chairperson of the Kickapoo tribe, attests–

[T]he sale of [fuel and oil] products draws customers and creates business that also generates the sale of other miscellaneous items . . . . Without the draw of the sale of fuel at a competitive price, customers would no longer bring their business to the Kickapoo Tribe Trading Post and the additional revenues from the trading post would be lost to the Tribe.

Id. at 25.

are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services." Id. at 156-57. At the same time, "Congress has made it clear in no uncertain terms that a state has a special and fundamental interest in its tax collection system." ANR Pipeline Co. v. LaFaver, 150 F.3d 1178, 1193 (10th Cir. 1998). A state's interest is "strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." Colville, 447 U.S. at 157.[15]

Like the tribe's cigarette sales in Colville, in this case the revenues resulting from the Tribes' retail fuel sales to non-Indian consumers traveling from outside Indian lands is not derived from value "generated on the reservations by activities in which the Tribes have a significant interest." Id. at 155. Although the result of the motor fuel tax may be to lessen, or even eliminate, tribal commerce with non-members, that market exists only because of the Tribes' claimed exemption from the fuel tax. See id. at 157.

---

[15] The express purpose of the motor fuel tax appears to benefit all who use the public highways in the State of Kansas–wholesalers who deliver the fuel over state highways, retailers whose businesses are located on or near state highways, and consumers who drive on state highways:

> **Purpose of tax.** The tax imposed by this act is levied for the purpose of producing revenue to be used by the state of Kansas to defray in whole, or in part, the cost of constructing, widening, purchasing of right-of-way, reconstructing, maintaining, surfacing, resurfacing and repairing the public highways . . . and for no other purpose whatever.

Kan. Stat. Ann. § 79-3402 (1999 Supp.).

37

However, until the Tribes provide us with verifiable projections based upon historic statistics indicating what portion of the Tribes' retail fuel sales is made to tribal members as compared to the general public, see Oklahoma Tax Comm'n v. Sac and Fox Nation, 508 U.S. 114, 128 (1993) (remanding for a determination of "whether the tribal members on whom Oklahoma attempts to impose its income and motor vehicle fuel taxes live in Indian country"), and what the precise economic realities of the situation are both in the presence and absence of the motor fuel tax, we cannot adequately balance the federal, tribal, and state interests as Supreme Court authority at this point requires. [16] But see Colville, 447 U.S. at 176-181 (Rehnquist, J., dissenting in part) (criticizing the balance of interests test as too fact specific and endorsing an inquiry based solely on congressional intent). In this regard, we note that on remand the burden is on the Tribes to show whether and to what extent the motor fuel tax would burden commerce derived from value generated on Indian lands. See id at 157-58 (placing burden on the tribe to show that absent a credit for tribal taxes paid, business at the smokeshops would be significantly reduced).

---

[16] Because the district court considered only the enforceability of the Kansas motor fuel tax on its face, we do not address the question of whether the tax, even if it survives Chickasaw Nation's balancing test generally, is invalid insofar as it is applied to fuel sold by the Tribes to customers who are tribal members and reservation residents. See Moe, 425 U.S. at 480-81. We leave consideration of that question in the first instance to the district court on remand.

Accordingly, the judgment of the district court is REVERSED and this cause

REMANDED for further proceedings consistent with this opinion.