# SUPREME COURT,

## STATE OF KANSAS.

## JULY TERM, 1872.

PRESENT—HON. S. A. KINGMAN, CHIEF JUSTICE.
HON. D. M. VALENTINE, } ASSOCIATE JUSTICES.
HON. D. J. BREWER,

JOHN C. BOBBETT *et al.* v. THE STATE, *ex rel.* DRESHER.

1. MANDAMUS; *Relator.* Mandamus will not lie at the instance of a private citizen to compel the performance of a purely public duty.

2. ———— *When to be Prosecuted by Public Officer.* Such a suit must be brought in the name of the state, and the county attorney and the attorney general are the officers authorized to use the name of the state in legal proceedings to enforce the performance of public duties.

3. ———— *When by Private Citizen.* Where a private citizen sues out a mandamus he must show an interest specific and peculiar in himself, and not one that he shares with the community in general.

*Error from Ottawa District Court.*

ON the 31st of October 1871 H. M. Dresher, W. W. Lambert, E. E. Eaton, O. B. Potter, C. C. Olney and Thomas Waddell, as relators, made and filed their petition in the district court of Ottawa county, alleging "that they are legal electors, tax-payers, and the lawful owners of lands and tenements in the town of Lindsay," etc., and praying that a writ of mandamus be awarded commanding *Bobbett, Morton* and *Carr*, constituting the board of county commissioners of said county, to pass an order for and cause an election to be held in said county for the relocation of the

2—10 KAS.

county-seat of the county of Ottawa." The facts stated as constituting grounds for the writ are substantially those found by the district court. No alternative writ was issued; but upon due notice to the commissioners the case was tried, in November 1871. The court found as conclusions of fact as follows:

1st.—That the board of county commissioners, at a regular session on the 4th of July 1871, on the petition of F. H. Cotton and others, legal voters of said county, for an election for the relocation of the county-seat of said county, ordered that an election for the relocation of said county-seat be held on the 21st of August 1871, and that the county clerk make publication of said election according to law, and that said order was entered on the records of said board. 2d.—That 360 of the legal voters of said county signed said petition; that the number of electors in said county, as returned by the last assessment rolls as found by said board, was 534, and that over three-fifths of the legal electors signed said petition. 3d.—That the county buildings at the county-seat cost the county less than $10,000, as admitted by both parties. 4th.—That on the 19th of July 1871, at a *special* meeting of said board, they entered on their records that they rescinded said order of 4th July. 5th.—That on the said 19th of July said board struck from said list of petitioners the names of 123 persons, solely because their names did not appear on the assessment rolls, although they were legal voters at that time; that after deducting said 123 names, there would not remain on said petition three-fifths of the names appearing on said assessment rolls; and the court find that said 123 names were not on the assessment rolls. 6th.—That said board have neglected and refused to appoint a day and cause notice to be given for an election to vote for the relocation of said county-seat.

As a conclusion of law the court found and decided that it was the duty of said board to appoint a day, and cause legal notice to be given, for an election for relocation of said county-seat, and rendered judgment awarding a peremptory writ of mandamus, directed to plaintiffs in error, ordering and commanding them within fifty days from the 4th of November 1871 to fix or appoint a day for an election, to be held in said county, for the relocation of said county-seat, and to cause

legal notice to be given of the same. From this judgment the board of commissioners appeal, and bring the case here on error.

*McClure & Humphrey,* for plaintiffs in error:

1. Under §§ 2 and 4, ch. 26, Gen. Stat., p. 297, the board of county commissioners were not authorized to order an election unless the petition was signed by three-fifths of the legal electors *whose names were upon the last assessment rolls* of the several township assessors in the county. The commissioners rightly excluded from the count the names of 123 of legal electors whose names were upon the petition, but not on the last assessment rolls, which left 237 names on the petition — said 237 being less than three-fifths, as required in § 2 of above act. The rule laid down by § 4 of said act was intended to apply not only for the purpose of ascertaining the *number* of petitioners required, but also to designate who are the electors *qualified* to sign the petition.

2. Sec. 5 of said ch. 26 provides that the election shall be held in fifty days from the presentation of the petition, which was on the 4th of July 1871. The time limited by law had expired before the service of a notice that an application for a mandamus would be made in the district court; and the court erred in its order, directing the commissioners to fix a day for holding an election, under the proceedings of said board at the session held July 4th 1871.

3. The board of county commissioners are vested with judicial functions in the discharge of the duties conferred upon them by ch. 26, Gen. Stat., and such discretion cannot be controlled by a superior court.

4. In a matter affecting public interests or rights, merely private individuals, possessing no peculiar or special interests or rights to be affected, cannot apply for the writ of mandamus: Moses on Mand., 194, 196; Hilliard on New Trials, 627; 5 Kas., 518; 4 Mich., 98. Mandamus is merely a civil remedy: 12 Peters, 615; 3 Howard, 100; 24 Howard, 97.

*A. L. Williams, A. J. Ingersoll,* and *John Guthrie,* for defendants in error:

The principal controversy seems to be the construction of § 4, p. 297, Gen. Stat., to-wit:

"Sec. 4. For the *purposes* of this act the *number* of legal electors in the county shall be ascertained from the last assessment rolls of the several township assessors in the county."

This section, though not very aptly expressed, provides a rule by which *the number* of legal voters in the county may be ascertained. That is, for "the purpose" of ascertaining the number of legal voters in the county, the county board shall look at the last assessment rolls, and if there be three-fifths *as many* legal electors petitioning for a submission of the question of relocating the county-seat as there appears on the said rolls, then it is the duty of the board to submit the question, whether the petitioners' names be or be not on said assessment rolls. It appears by the second special finding of fact "*that over three-fifths of the legal electors signed said petition.*" It does not appear from the findings of the court that there were more than 534 legal voters in Ottawa county in July 1871. It is true there was that number on the assessment rolls; how many have removed from the county between the 1st of March and July does not appear. The statute does not require that such petitioners or electors shall be on the assessment rolls before they can petition or vote at an election for the relocation of a county-seat; nor is there any property qualification prescribed. Any person who may vote at any other election may vote on this question. It follows, that the intention of the statute is,* that when three-fifths of

[*QUERY: Said ch. 26 was approved March 2, 1868. Were not the words "last assessment rolls," in § 4, *intended* (though not "aptly so expressed") to refer to and mean the list of adult persons required by the act of February 26, 1867, (ch. 86, Gen. Stat. 1868, p. 894,) to be made annually by the *assessor* "when making the assessment of property?" Said assessors' lists are to be filed and kept "in the office of the county clerk." See §§ 1, 2, 3, of said ch. 86, Gen. Stat. "For the purposes" of procuring an order for a "county-seat election," the number of male adults over 21 years of age named on all said lists "shall be taken as conclusive" as to the *number* of petitioners required. For the purposes of obtaining a dram-shop license, (§ 1, ch. 35, Gen. Stat.,) the whole number of names (males and females) on the said list for any township "shall be taken as conclusive" in determining the requisite *number* of petitioners for such township.—REPORTER.]

the electors of the county shall ask this question to be submitted, that it then becomes the duty of the board doing county business to order an election. (Section 2, page 297, General Statutes of 1868.)

The opinion of the court was delivered by

Brewer, J.: Counsel for plaintiffs in error have abandoned all the points but one in this case, and upon that rest their claim for a reversal of the judgment of the district court. Defendants in error applied for a mandamus to compel plaintiffs in error, who constitute the board of county commissioners of Ottawa county, to submit to a vote of the people the question of relocating the county-seat. They allege themselves to be "legal electors, tax-payers, and the lawful owners of lands and tenements in the town of Lindsay," a place other than the present county-seat. Does this show such an interest as entitles them to the mandamus? This is the only question presented for our consideration. When mandamus is sought to enforce some matter of private interest, the relator must show such interest in himself. A stranger may not interfere when the party beneficially interested is himself silent. Upon this there is no controversy. But where the proceedings are for the enforcement of a duty, affecting not a private but a public right, one common to the whole community, there is great conflict of authority as to who may apply for the writ, and what interest must appear in the relator. In *Sanger v. County Comm'rs*, 25 Maine, 291, Tenney, J., says: "A private individual can apply for this remedy only in those cases where he has some private or particular interest to be subserved, or some particular right to be preserved or protected by the aid of this process, independent of that which he holds in common with the public at large; and it is for the public officers exclusively to apply when public rights are to be subserved. Supporting this view are the cases of *Bates v. Plymouth*, 14 Gray, 163; *People v. Regents of the University*, 4 Mich., 98; *People v. Inspectors of State Prison*, 4 Mich., 187; *Heffner v. The*

*Commonwealth*, 28 Penn St., 108. On the other hand, in *Hamilton, Auditor, v. The State*, 3 Ind., 452, the court uses this language: "That the defendant should discharge correctly the duties of his office, was a matter in which Bates, as a citizen of the county, had a general interest; and that interest was of itself sufficient to enable him to obtain the mandamus in question, and have his name inserted as the relator." And sustaining this are the following: *The People v. Collins*, 19 Wend., 56; *County of Pike v. The State*, 11 Ill., 202; *State v. County Judge*, 7 Iowa, 186; *State v. Bailey*, id., 390; Moses on Mandamus, 197.

It is evident from these citations that a decision either way would be well supported by authority. Here the relators show no interest differing in kind or degree from that of the community in general. They simply allege that they are voters, pay taxes, and own property. That this gives them no specific, peculiar, interest in the question is well shown by the opinion in the case of *Craft v. Comm'rs Jackson County*, 5 Kas., 518. That the duty sought to be enforced is a public duty, one affecting the whole community, is also clear. The question is therefore narrowed down to this: Can a private citizen by mandamus compel the performance of a public duty? To allow any citizen to litigate with public officers the propriety of their acts, exposes them to constant litigation. If one may, so may another. If one act may be litigated, so may all; and so the time, attention and thought of the officer diverted from the duties of his office to the defense of harassing suits. This topic is pursued at length in the case of *Craft v. The Comm'rs of Jackson County*, just cited, and needs no further discussion here.

Again, mandamus, like other proceedings under our code, should be brought in the name of the party interested. *The State ex rel. Wells v. Marston*, 6 Kas., 532. Where a public duty is neglected, the public, the community as a whole, is the party interested. Where a wrong is done to a corporation, not a stockholder, an individual member, but the corporation itself appears as plaintiff, and pursues the remedy.

Where the law of the state is broken by the commission of a crime, the state prosecutes, not the individual. It is not "John Doe against John Smith," (charge, murder,) but "The State of Kansas against John Smith." Not only is the state the nominal plaintiff, but public officers, and not private citizens, conduct the prosecution. So, where a public duty is neglected, the party wronged, *the public*, should be the complainant, and her officers should conduct the suit. The great business of the public is carried on by agents, officers whom the people select; and if the public suffers wrong, it is the duty of those agents to see that such wrong is righted. The county attorney and attorney general are the officers specially charged with the duty of representing the public in all litigation. Gen. Stat., ch. 25, §136, p. 284; ch. 102, §64, p. 986. They can use the name of the county, or state, to pursue any remedy. If they decline to institute proceedings, when proceedings ought to be instituted, the courts may perhaps on a proper showing compel them to proceed, or permit others to use the name of the state, so that justice may not fail. Here there is no suggestion of any unwillingness of either the county attorney or the attorney general to take any legal measures deemed necessary to enforce the performance of the alleged neglected duty.

But the statute authorizes the issue of the writ "on the information of the party beneficially interested." Civil Code, §689. This evidently refers to an interest peculiar and specific, and not one common and general. All citizens are in a certain sense interested in the proper discharge of their duties by public officers, but it is not such an interest as will enable each citizen to describe himself as "*the party* beneficially interested." *The party* beneficially interested in the discharge of a purely public duty, is *the public*. These considerations all point to the conclusion that a private citizen may not invoke the aid of mandamus to compel the performance of a purely public duty, as was well said by Woodward, J., in the case from 28 Penn. St., heretofore cited: "In order to obtain a writ of mandamus, the applicant must have a

right to enforce which is specific, complete, and legal, and for which there is no other specific legal remedy. When public rights are to be subserved, public officers must apply for the writ. But if a private individual make himself the relator, he must show some particular right or privilege of his own, independently of that which he holds with the public at large."

The judgment of the district court must be reversed and the case remanded.

All the Justices concurring.