354

(310 P.3d 404)
No. 108,607

Kansas Building Industry Workers Compensation Fund,
*et al., Appellants,* v. State of Kansas, and Kent Olson,
Director of Division of Accounts and Reports,
Department of Administration, *Appellees.*

Opinion filed September 6, 2013.

*Michael R. O'Neal* and *Shannon L. Holmberg,* of Gilliland & Hayes, P.A., of Hutchinson, for appellants.

*Derenda J. Mitchell,* assistant attorney general, and *Derek Schmidt,* attorney general, for appellees.

Before BRUNS, P.J., HILL, J., and ERNEST L. JOHNSON, District Judge Retired, assigned.

HILL, J.:

## INTRODUCTION

The law requires some businesses and individuals to pay certain fees and assessments to the State of Kansas if they wish to practice their trade or transact business in Kansas. Once paid, these fees are credited to different fee fund accounts in the State Treasury. In 2009, as a result of the enactment of H.B. 2373, the State Director of Accounts and Reports transferred large sums from various fee funds into the State General Fund. As a result of the transfer of funds, the Kansas Insurance Department, the Real Estate Commission, and the Office of the State Bank Commissioner, all state agencies authorized to make these fee assessments, made new assessments in order to replenish the depleted fee funds. This meant that if you wanted to do business in Kansas and the law required you to pay a licensing fee, after the enactment of H.B. 2373 you had to pay a fee in addition to what had been required before the law was signed. Some people believed this was a tax on their businesses that was levied simply to raise revenue.

Several trade associations, comprised of entities and individuals required to pay these fees and assessments, filed a lawsuit contending the legislature's "sweep" of the fee accounts was an invalid exercise of police powers. They maintained H.B. 2373 was actually an attempt to raise general revenue that was greatly out of proportion to the bill's stated purposes of reimbursement for "accounting, auditing, budgeting, legal, payroll, personnel and purchasing services." The lawsuit never got off the ground.

For its part, the district court agreed with the State and dismissed the lawsuit after concluding the Plaintiffs lacked standing

to raise their claims. The court explained that since historically concerns of the general public about legislation have been brought to court through legal actions taken by the attorney general, or a county or district attorney, it was up to the public prosecutors and not trade associations to pursue any public interest aspects of this controversy. Additionally, the court reasoned that the essence of the Plaintiffs' complaints were the State agency actions of raising new fees, taken in response to H.B. 2373. And according to the district court, the only way to obtain a judicial review of agency actions is by pursuing a legal action under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.*, which the Plaintiffs did not do. Thus, the court dismissed the lawsuit since the Plaintiffs failed to make a valid claim against the agencies under the Act.

We reverse and remand this case because the district court erred when it ruled the Plaintiffs had no standing to bring this action. They indeed appear to be uniquely damaged by the legislative enactment in a way that the general public is not—they had to pay increased fees. Thus, this lawsuit was not one that had to be brought by the attorney general or a county or district attorney. Also, the Plaintiffs were not required to bring a case under the Kansas Judicial Review Act because the state agencies cannot give the primary relief the Plaintiffs seek—the declaration that H.B. 2373 is unconstitutional.

Because the district court dismissed this action solely upon the grounds of standing and the Plaintiffs' failure to pursue a remedy under the Judicial Review Act, we will not address questions that the district court has had no opportunity to answer first. These questions include: whether the district court properly denied class certification; whether the defendants are immune from suit; whether this is a political question; or whether the Plaintiffs can seek mandamus or quo warranto relief. The district court must address those issues on remand. We do not know how this controversy will end, but we do know it can begin.

## THE LEGISLATIVE ACTION LEADING TO THIS LAWSUIT

In 2009, yearly revenue estimates for Kansas state government did not support approved expenditures. Accordingly, the Governor

presented the legislature with a revised budget for the year. The recommended changes to the revenue side of the budget included a proposed transfer of $29 million from special revenue funds into the State General Fund to help balance the budget.

The list of proposed transfers to the State General Fund included a transfer from the Workers Compensation Fund, the Real Estate Fee Fund, and the Bank Commissioner Fee Fund. The 2009 legislature ultimately passed H.B. 2373, which contained some of the recommended transfers. The Governor signed the bill into law and it became effective June 11, 2009.

H.B. 2373 authorized and directed the State Director of Accounts and Reports to transfer $2.355 million from the Workers Compensation Fund to the State General Fund; $195,671 from the Real Estate Fee Fund to the State General Fund; and $534,517 from the Bank Commissioner Fee Fund to the State General Fund. The bill stated that the amounts transferred from these funds were for accounting, auditing, budgeting, legal, payroll, personnel and purchasing services, and any other governmental services performed on behalf of the affected agencies by other state agencies that receive appropriations from the State General Fund to provide such services.

### The Effect of H.B. 2373 on Three State Agencies

*Insurance Commissioner*

Most Kansas employers are required to provide workers compensation coverage for their employees. To comply with this law, an employer may self-insure or may obtain an insurance policy from an authorized insurance carrier or from a group-funded workers compensation pool. The State certifies the various insurers that can provide workers compensation coverage to employers. These insurers also fund the operations of the Workers Compensation Fund, a statutory fee fund administered by the Kansas Commissioner of Insurance. The Workers Compensation Fund pays workers compensation awards in some claims to certain handicapped workers arising prior to July 1, 1994, and other unique awards as set out in K.S.A. 44-566 *et seq.*

Every year in June, the Commissioner of Insurance shall impose an assessment against all workers compensation insurers that funds the Workers Compensation Fund. These assessments are to be in an amount sufficient to pay all attorney fees and costs that are required to be paid from the Fund during the current year. The Commissioner assesses an amount to each insurer based upon that insurer's proportion of claims paid on its behalf during the previous year. When the Commissioner receives those assessments, they are remitted to the State Treasurer, who deposits them in the State Treasury to the credit of the Workers Compensation Fund. K.S.A. 2012 Supp. 44-566a(b).

In June 2009, the Kansas Insurance Department, at the direction of the Commissioner of Insurance, notified all insurers who pay into the Workers Compensation Fund of the 2010 assessment. The notice stated that the 2009 Kansas Legislature had swept funds held in the Workers Compensation Fund. The notice indicated that this sweep of funds made it necessary for the Insurance Department to levy an assessment of 1 percent for the year. In June 2010 and June 2011, the Department sent out additional notices similarly indicating that because actions by the legislature continued to reduce the Workers Compensation Fund, the Department would again have to assess additional fees to the insurers.

*Real Estate Commission*

Anyone wanting to be a licensed real estate agent or broker in Kansas must pay licensing fees to the Kansas Real Estate Commission. K.S.A. 2012 Supp. 58-3063. The Kansas Association of Realtors is a professional trade association comprised of individuals who are licensed by the State. To stay licensed, members of the Association pay license fees to the Kansas Real Estate Commission every 2 years.

The Director of the Kansas Real Estate Commission remits all license fees along with any other charges and penalties collected during the year to the State Treasurer, who then deposits the money in the State Treasury. Under Kansas law, prior to recent amendments, 20 percent of the deposits must be credited to the State General Fund with the balance credited to the Real Estate

Fee Fund. K.S.A. 58-3074(a). The $195,671 transferred from the fee fund as a result of H.B. 2373 was *in addition* to the statutory 20 percent required by the prior law.

*Bank Commissioner*

The Kansas State Bank Commissioner is charged with administering the laws regulating banks, savings and loans, mortgage businesses, as well as the consumer credit laws in Kansas. The law authorizes the assessment of fees to help defray the costs associated with the administration of the Commissioner's statutory duties. Prior to the start of each fiscal year, the Commissioner estimates what expenses will arise in the State Banking Division and then assesses all Kansas chartered banks and lenders an amount to help fund these expenses. K.S.A. 2008 Supp. 9-1703(a). The Commissioner remits all fees and assessments it collects to the State Treasurer, who then deposits the money in the State Treasury. Under Kansas law, prior to recent amendments, 20 percent of this deposit must be credited to the State General Fund, with the balance credited to the Bank Commissioner Fee Fund. K.S.A. 2008 Supp. 75-1308.

After H.B. 2373 became law, the Bank Commissioner increased fees of all banks and lenders due to the Kansas Legislature's decision to "sweep" funds from the Banking Division. Beginning in 2010, the Office of the Bank Commissioner also began assessing new license fees.

## THE LAWSUIT

In June 2011, three different groups that bring this appeal (hereafter referred to as the Plaintiffs) came together and filed a lawsuit in Shawnee County District Court against the State of Kansas and Kent Olson—the Director of the Division of Accounts and Reports within the Department of Administration. They challenged what they called the legislature's "conversion" of funds from the various fee fund accounts into the State General Fund by virtue of H.B. 2373. The Plaintiffs include:

- insurers who provide workers compensation insurance and are required to pay assessments into the Workers Compensation Fund;

- the Kansas Association of Realtors, comprised of real estate agents and brokers who must pay licensure fees every 2 years to the Real Estate Fee Fund; and
- the Kansas Bankers Association, a trade association made up of lenders required to pay licensure fees and assessments to the Bank Commissioner Fee Fund.

The Plaintiffs claimed the legislative "sweep" of their fee funds was a general revenue-raising measure that was not a valid exercise of police power authority, contending the fees transferred to the General Fund exceeded the reasonable costs of regulation and administration incurred by the State on behalf of the agencies. The Plaintiffs argue the sweeps constituted (1) an unauthorized tax and revenue enactment in violation of Article 11, § 5 of the Kansas Constitution; (2) an unconstitutional taking in violation of the Commerce Clause and the Fifth and 14th Amendments to the United States Constitution; and (3) a denial of the Plaintiffs' federal and state equal protection rights.

The Plaintiffs sought declaratory judgment relief that would rule the fee transfers as unconstitutional. The Plaintiffs also sought mandamus or quo warranto relief against Kent Olson, asking the court to order Olson to reverse the fee transfers and refund the agencies' funds.

In a separate motion, the Plaintiffs also asked the court for class action certification. The Plaintiffs alleged there were numerous workers compensation insurers, real estate persons, and banks and lenders with a potential claim in the case. The Plaintiffs argued that joinder was impracticable in the case, there were questions of fact and law common to the class, each of the named Plaintiffs' claims were typical of the class, and the named Plaintiffs would fairly and adequately protect the interests of the class.

In response, the State and the Department of Administration, on behalf of Olson, asked the court to dismiss the case. The State contended that the court did not have subject matter jurisdiction because the Plaintiffs lacked standing to bring their claims. Additionally, the State argued the case was a political question that was not justiciable. The State raised other defenses as well:

- the Plaintiffs failed to state a claim upon which relief could be granted because there had been no constitutional violations;
- all of the defendants were immune from suit;
- the Plaintiffs had failed to properly proceed under the Kansas Judicial Review Act; and
- the attorney general was the proper plaintiff.

## WHAT THE DISTRICT COURT HELD

In dismissing the case, the court in its 60-page memorandum opinion and order concluded the Plaintiffs' claims must fail because they lacked standing to sue and the Plaintiffs had no remedy. In reaching this conclusion, the court said it would assume the Plaintiffs' claims were true in that the additional fees assessed by the respective agencies would not have been imposed but for the legislative transfers from the fee funds. Nevertheless, the court noted that an agency decision to impose a fee, assess a new fee, or increase a fee clearly constitutes agency action that can only be challenged under the Judicial Review Act.

The court noted the Plaintiffs did not sue the agencies that assessed the additional fees against them but instead sued the Director of Accounts and Reports—who the court said had no independent authority to undo the fee fund transfers ordered by the law. The court reasoned that even if the transfers were unlawful, it did not follow that the Director's actions harmed the Plaintiffs. The court said it was the *agencies' responses* to the legislature's transfers from the fee funds that were the gravamen of the Plaintiffs' complaints. The court noted that in response to the fee transfers, the agencies in their discretion could have cut back on expenses, for example, instead of passing the assessments along to the Plaintiffs.

Additionally, the court observed that even if the Plaintiffs had brought their claims under the Judicial Review Act, there would have been no remedy available to them under the Act. The court said the "best result" that could have been accomplished under the Act would have been a finding that the agencies assessed excessive

or unreasonable fees onto the Plaintiffs—so that the fees were unlawful.

The court said that if such a determination were made, the Plaintiffs would have been entitled to a rebate from their respective agencies. But the court said the Act does not contain a means for curing or enforcing a restoration of misallocated funds that were previously dedicated somewhere else. And the court also noted the Act has no mechanism for adding parties such as the Director of Accounts and Reports and the State Treasurer, which would be necessary to reverse the transfer of funds as desired by the Plaintiffs. According to the court, then, the agencies would have had to reimburse the Plaintiffs from their own funds—and the court opined the agencies would have lacked sufficient funds to do so. Thus, the court believed that in order for the agencies to refund the Plaintiffs, the agencies would have had to reduce their services—which would render them unable to perform their statutory duties. The court reasoned that this under-performance of the agencies' statutory duties would be an issue of concern to the general public.

Thus, the court concluded:

"If the Legislature wrongfully directed the Director to act, it is the legislative act and its effect on the revenues of the affected agencies that represents the public policy aspects of this case and which undermines any Plaintiffs' standing to challenge it directly by way of an independent action since such complaint is not unique to Plaintiffs, but to the public generally."

The court went on to explain that concerns which affect the general public have historically been left for prosecution through the attorney general or a district or county attorney. The court noted that in this case, the attorney general was "stand[ing] on the other side" of the case—as he was representing the State. The court said that absent the attorney general's change of position on the matter, the public interest aspects of the case would cause an independent action such as this to fail for want of a·public representative to pursue the matter. Thus, the court suggested the Plaintiffs' claim be handled by the attorney general, ruling the Plaintiffs had until September 9, 2011, to "secure the substitution of the Attorney General of the State of Kansas or his special designee to

prosecute" the case in light of the public interest aspects of the case.

The court then said that in the alternative, the Plaintiffs could pursue individual claims under the Judicial Review Act. The court said it was "clear" that no remedy existed in the Plaintiffs' *"en masse"* challenge to fees imposed as a result of the legislative transfers but observed that any Plaintiffs who objected to the imposition of agency fees could seek individual relief under the Act. Nevertheless, the court questioned the timeliness of potential claims under the Act. The court noted that in this case, the legislative fee transfers were ordered "long before" these Plaintiffs filed suit and the Act requires an appeal from an agency order within 30 days.

The court also ruled that any Plaintiff who claimed to have standing had until September 9, 2011, to amend the petition to assert an individual claim under the Judicial Review Act. The court stated that if no action was taken under one of the above two options (*i.e.*, the substitution of the attorney general as Plaintiff or the amendment of the petition to assert individual claims under the Act), the court would dismiss the Plaintiffs' case for lack of subject matter jurisdiction.

Finally, on July 20, 2012, the court dismissed the case for lack of subject matter jurisdiction, finding the Plaintiffs lacked standing to raise their claims. The court first observed that any challenge to the fee fund transfers was "reserved for a public official." And the court reasoned the individual Plaintiffs could only proceed via an administrative challenge to the agencies' assessment of fees against them. But the court noted these Plaintiffs had failed to demonstrate that they challenged the agencies' assessment of fees against them so as to preserve an action under the Act. The court noted it was "manifestly clear" that the Plaintiffs were not intending to proceed under the Act. With regard to the Plaintiffs' request to certify them as representatives of a class, the court concluded that each of the Plaintiffs needed to have first established standing in order for the court to permit class certification and denied that motion as well.

## WHAT WE MEAN BY THE TERM "STANDING"

The doctrine of standing to sue is illustrated in several cases. A

person must demonstrate that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct to have standing to file a lawsuit in Kansas courts. *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 761, 189 P.3d 494 (2008). Standing to sue means that a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. *Dutoit v. Board of Johnson County Comm'rs*, 233 Kan. 995, 1003, 667 P.2d 879 (1983). To have standing to assert a claim, a person must assert that he or she has a personal stake in the outcome of a case so as to justify court action to resolve the matter. See *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 30, 59 P.3d 1003 (2002).

Indeed, standing is a jurisdictional issue in Kansas. If you have no standing, the controversy before the court is not justiciable; therefore, the court has no subject matter jurisdiction because it cannot issue advisory opinions. The existence of jurisdiction and standing are both questions of law over which an appellate court has unlimited review. *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 185, 106 P.3d 483 (2005).

## WHY THE PLAINTIFFS HAVE STANDING

The district court appears to have misconstrued the concept of standing as it relates to matters of public concern. The court found the Plaintiffs' claim involved a matter of public concern because the Plaintiffs' *possible remedy* may have an adverse impact upon the general public. In other words, the court found that an order directing the refund of the money to the Plaintiffs could result in a diminishment of public services. But standing involves whether a plaintiff has a *particular injury* that is different from the general public—not whether the plaintiff's remedy would affect the general public.

The Plaintiffs clearly have a stake in the outcome of this controversy. The damage alleged by the Plaintiffs is entirely different from any harm that members of the general public experienced. H.B. 2373 reduced the fee funds that the Plaintiffs paid into, and the Plaintiffs were required to pay increased fees and assessments in order to replenish those funds. That increase in fees was the

specific injury suffered by the Plaintiffs. Members of the general public do not pay into the fee funds, and, therefore, they could have suffered no special harm from the fee transfers caused by the enactment of H.B. 2373. In the event that the fee transfers were reversed by a court, any possible harm to the public upon that occurrence would be speculative at this point and would only *oppose* a possible remedy of the Plaintiffs and not deny them the right to sue.

The three cases relied upon by the district court are distinguishable due to dissimilar facts. They are all cases dealing with mandamus (and quo warranto in one). The court cited *Kansas Bar Ass'n v. Judges of the Third Judicial Dist.*, 270 Kan. 489, 14 P.3d 1154 (2000); *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 53, 687 P.2d 622 (1984); and *Bobbett v. State, ex rel. Dresher*, 10 Kan. 9, 1872 WL 685 (1872).

In *Kansas Bar Ass'n*, the court held the Kansas Bar Association and two named attorneys lacked standing to bring an action in mandamus asking the court to find unconstitutional a statute that prohibited attorneys from representing clients in small claims court. 270 Kan. at 489-90, 497-98. In doing so, the court reasoned that neither the Bar Association, nor the named attorneys, had shown a specific injury or interest not shared with the public at large. 270 Kan. at 497-98. The court noted their petition did not precisely state the nature of the injury claimed by the plaintiffs; the plaintiffs alluded to *a possible injury to the public and all lawyers*; and the plaintiffs suggested a potential injury to the citizens of Kansas as a result of legislative action. 270 Kan. at 492.

Next, using theories of quo warranto and mandamus, the attorney general in *Stephan* was challenging the constitutionality of a statute. The *Stephan* court simply held that when an attorney general brings an action for quo warranto and mandamus, the action is acceptable where numerous persons are affected by the challenged legislation and the case presents an important public question. 236 Kan. at 53. *Stephan* does not hold that *only* an attorney general can raise a challenge to the constitutionality of legislation.

Then, going back to the early days of statehood, the *Bobbett* court held in 1872 that a private citizen may not invoke the aid of

mandamus to compel the performance of a purely public duty. 10 Kan. at 15. The court acknowledged that if a private individual wants to bring an action in mandamus, he or she " 'must show some particular right or privilege of his own, independently of that which he holds with the public at large.' " 10 Kan. at 16. The court indicated a private individual can pursue this remedy " 'only in those cases where he has some private or particular interest to be subserved, or some particular right to be preserved or protected by the aid of this process, independent of that which he holds in common with the public at large; and it is for the public officers exclusively to apply when public rights are to be subserved.' " 10 Kan. at 13.

Unlike these three cases cited by the district court, the Plaintiffs suffered a particular harm that differed from any harm that could possibly be suffered by members of the public at large. Here, there was no claim that H.B. 2373 caused harm to the general public; the Plaintiffs only complained about the bill's impact on them specifically. Here, in contrast to the cases relied upon by the district court, the Plaintiffs asked for a declaratory judgment deeming H.B. 2373 and the transfers unconstitutional. There was nothing vague or speculative in the Plaintiffs' amended petition.

## MORE SPECIFIC CASES ARE HELPFUL IN THIS ANALYSIS

In this appeal, the Plaintiffs acknowledge that it was indeed the three State agencies that imposed the additional fees and assessments upon them to restore lost funds. But they argue that when a tax is simply passed along in this manner, Plaintiffs such as themselves have standing to sue the State directly. For support, the Plaintiffs cite *Watson v. City of Topeka*, 194 Kan. 585, 400 P.2d 689 (1965), and *Sac and Fox Nation of Missouri v. Pierce*, 213 F.3d 566 (10th Cir. 2000).

In *Watson*, the Watson Corporation sued the City of Topeka, challenging the constitutionality of a city ordinance that required persons with construction permits to pay fees for the use of city streets and sidewalks during construction. Under the ordinance, Watson was required to pay fees for temporary use of a city street. The district court found the fees imposed by the ordinance were

not proportional to the city's costs of inspection and regulation and ruled the ordinance was unconstitutional. On appeal, the City argued Watson lacked capacity to bring its claim. In rejecting this argument, the court said:

"Although a private person may not, in general, maintain an action to vindicate or enforce a mere public right in which his interest is no different than those of the public in general [citation omitted], the rule is subject to a well recognized exception. Where an individual suffers damage *different in character* from that sustained by the public at large, he is held to be entitled to maintain an action to restrain illegal acts by public officials. [Citation omitted.]" (Emphasis added.) 194 Kan. at 587.

After noting this exception has been applied in Kansas, the court held Watson was a proper plaintiff because there was no denial that the ordinance could adversely affect Watson's interests in particular. 194 Kan. at 588. The court also concluded that even though it observed Watson would be treated no differently than other contractors under the ordinance, Watson and other contractors in the same category would suffer damage "of a nature not sustained by the public in general." 194 Kan. at 588.

Likewise, in *Sac and Fox*, several Indian tribes sued the Secretary of Revenue in federal court when the State began imposing a motor fuel tax on gas distributors who sold that gas to retailers in Kansas. The Tribes, retailers of gas on Indian land in Kansas, sought declaratory and injunctive relief based on state and federal law exempting them from paying such taxes. On appeal from the district court's determination that the tax was invalid as applied to the Tribes, the State argued the Tribes lacked standing to bring the suit. The State pointed out the legal incidence of the tax was imposed upon the *distributors* of the gas—not the tribal retailers. The State claimed the law did not confer standing upon the Tribes merely because they were forced to pay a higher cost of the fuel distributed to them or because they had to pass the cost along to their customers.

In rejecting the State's argument, the Tenth Circuit reasoned the Tribes had standing to challenge the State's law because the Tribes met all three constitutional requirements for standing and all three "prudential" requirements for standing. 213 F.3d at 573-

75. These constitutional requirements are that the plaintiff alleges (1) a concrete and particularized actual or imminent injury; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable court decision will redress the injury. 213 F.3d at 573.

According to the 10th Circuit, the "prudential" requirements for standing to sue are: (1) the plaintiff asserts his or her own rights as opposed to those of a third party; (2) the plaintiff's grievance is not a general one shared by a large class of citizens; and (3) the interests which the plaintiff seeks to protect are arguably within the zone of interests protected by statutory or constitutional guarantee. 213 F.3d at 573.

In finding these requirements were met by the Tribes, the court noted:

- the Tribes alleged a particularized imminent economic injury if the State imposed a tax on fuel distributed to the Tribal retail stations;
- the Tribes' alleged injury was directly traceable to the State's desire to tax the fuel distributions;
- a decision in favor of the Tribes—enjoining the State from enforcing the tax against the Tribes' distributors—would likely redress the Tribes' injury since the distributors responsible for paying the tax pass the cost along to the Tribes;
- the Tribes had asserted their own rights to be free from the tax even though a decision in their favor would undoubtedly benefit the distributors and consumers as well;
- regardless of where the legal incidence of the tax fell, the Tribes had a particularized claim of injury rather than a generalized grievance; and
- the alleged economic interests of the Tribes were arguably within the zone of interests which federal law seeks to protect, as the Supreme Court has repeatedly recognized the United States' interest in securing immunity to Tribes from state taxation. 213 F.3d at 573-74.

The circumstances before the court in *Sac and Fox* are very similar to the situation here. Like the Tribes in *Sac and Fox*, the Plaintiffs in this case are complaining about an action that was not

directly taken by the agencies but passed along to them. Like the Tribes, the Plaintiffs are suing the State—the entity that initially enacted the legislation that led to the Plaintiffs' injury. The Plaintiffs are not suing the agencies—which are in the same position as the distributors in the *Sac and Fox* case—they merely passed the fee increase along. They were permitted to jump over the entity obeying the orders in order to challenge the body *making* the orders.

And, like the Tribes, the Plaintiffs in this case meet each of the constitutional and prudential requirements for standing. The Plaintiffs have alleged a concrete and particularized economic injury as a result of the State's transfers from fee funds of the state agencies to the General Fund. Because of the fee fund transfers, the Plaintiffs were forced to pay increased fees and assessments in order to replenish their respective fee funds. This grievance is not one shared by members of the public at large, as members of the public do not pay into the fee funds. The Plaintiffs have asserted their own right to be free from what they view as an unlawful tax.

Although a decision in the Plaintiffs' favor could potentially affect members of the general public, the Plaintiffs have asserted their own right to be reimbursed for the increased fees and assessments they were forced to pay. We are not, at this point, weighing equities or determining remedies but deciding a question of standing. The Plaintiffs' alleged injury is directly traceable to the State's attempt to balance the State's budget by transferring funds from various agency fee funds to the General Fund.

These authorities persuade us that the Plaintiffs have a unique stake in this controversy. We must now determine if this is a justiciable controversy. See *Dutoit*, 233 Kan. at 1003. A prior Kansas Supreme Court case teaches us it is.

## *PANHANDLE EASTERN PIPE LINE CO.* ADDRESSED A SIMILAR QUESTION

Our Supreme Court has held that the State may only reimburse itself for the legitimate costs of regulation and supervision (*i.e.,* what is reasonable and necessary) through legislative transfers from fee funds to the State General Fund. See *Panhandle Eastern Pipe*

*Line Co. v. Fadely*, 183 Kan. 803, 806-07, 332 P.2d 568 (1958). We follow the lead of the Supreme Court and consider this to be a question of the propriety of an exercise of police powers of the State and is thus a justiciable controversy.

The Panhandle Eastern Pipe Line Company brought suit against the State Treasurer and the State Corporation Commission requesting a declaratory judgment that two Senate bills were unconstitutional. One of the bills directed the Treasurer to transfer $100,000 from the Natural Gas Conservation Fund (administered by the State Corporation Commission) to the State General Fund; the other bill directed the Treasurer to credit the General Fund with 20 percent of all costs collected by the Corporation Commission (with the remaining 80 percent to be deposited in a special fund for the Commission's administrative costs).

Prior to the enactment of the Senate bills, the Corporation Commission had levied assessments to pay the Conservation Division's expenses. Just before the bills were enacted, the Commission had reduced its assessments after determining there were sufficient funds to pay the Division's expenses. But after the $100,000 fee transfer, the Commission restored its former assessment order.

In its challenge to the constitutionality of the bills, Panhandle argued the legislative transfer of $100,000 to the State General Fund was a revenue-raising measure that deprived it of its property without due process and violated Article 11, §§ 1 and 5 of the Kansas Constitution. Panhandle further argued the exaction of 20 percent of costs paid to the Commission violated the Commerce Clause and the 14th Amendment of the United States Constitution. The State countered that the $100,000 transfer and the 20 percent exaction covered indirect expenses incurred by the Commission and paid by the State. The State argued the Kansas and United States Constitutions did not prevent it from seeking "reasonable recompense for the assistance in regulation and supervision rendered by other departments." 183 Kan. at 806.

In affirming the district court's determination that the bills were unconstitutional, our Supreme Court noted:

"[I]t is clear that under its police power the state may reimburse itself for the costs of otherwise valid regulation and supervision by charging the necessary ex-

penses to the businesses or persons regulated. [Citations omitted.] A statute, however, is void if it shows on its face that some part of the exaction is to be used for a purpose other than the legitimate one of supervision and regulation [citation omitted], or if more than adequate remuneration is secured [citations omitted]. Where interstate commerce is involved and the statute shows that expenses other than those of legitimate supervision and regulation are defrayed from the assessments levied on the regulated businesses, or the income derived from the fees collected so far exceeds the expenses of regulation as to impugn the good faith of the law, it cannot stand, either under the commerce clause or under the Fourteenth Amendment to the Federal constitution." 183 Kan. at 806-07.

The *Panhandle* court looked at the language of the enactments, observing:

(1) the bills at issue did not expressly declare that the amounts transferred to the General Fund were to reimburse other departments and agencies for indirect assistance rendered to the Commission; and

(2) the bills directed payment of the funds to the General Fund without any limitation.

Thus, the court held that the most reasonable inference to be drawn from the legislation was that the funds were to be used indiscriminately for general expenses. 183 Kan. at 807-08. The Supreme Court affirmed the district court's conclusion that the bills were unconstitutional, stating:

"When a regulatory measure openly becomes a revenue enactment, that portion thereof which exacts revenue fails as a valid exercise of the police power. We are of the opinion that [the bills at issue] amount to a tax and a revenue measure levied under the guise of a regulatory fee, and violate article 11, section 1 of our state constitution, the commerce clause and the Fourteenth Amendment of the Federal constitution." 183 Kan. at 808.

The facts and legal issues presented in *Panhandle* are nearly identical to those present here. But we note four differences that distinguish *Panhandle* from this case:

(1) *Panhandle* did not address concerns about standing and jurisdiction;

(2) we must presume the Corporation Commission passed the assessment onto the plaintiffs who funded the fee fund (as

was done in the current case), since the *Panhandle* court did not clarify this fact;

(3) *Panhandle* was decided before the enactment of the Kansas Judicial Review Act; and

(4) the two Senate bills at issue in *Panhandle* did not contain express language stating the transfers were intended to reimburse the State for indirect expenses paid on behalf of the agency.

While *Panhandle* may not be absolutely controlling, it does point the way to a correct resolution of the question of standing. Despite the differences, *Panhandle* clearly demonstrates that the question of whether legislative fee fund transfers to the State General Fund are constitutional is indeed a justiciable question for those aggrieved by increased fees and assessments and it may be addressed on the merits by a court of law.

Along this same line, we note an attorney general opinion that gives similar advice. In Attorney General Opinion No. 02-45, at *5 the attorney general stated:

"If an assessment is determined to so exceed the cost of regulation that it is apparent the Legislature is using it as a general revenue raising measure, the overage cannot stand on police power authority. If the assessment is in fact a revenue raising measure, it must be analyzed as such, which may include a determination as to whether it meets Commerce Clause and Equal Protection requirements, as well as any state constitutional requirements applicable to the type of tax that it is."

To sum up, persuasive legal authority does not support the district court's conclusion that the attorney general or some other prosecutor was required to raise these claims instead of the Plaintiffs. We cannot agree with the court's reasoning on this point. The unique damages claimed by the Plaintiffs give them a stake in this justiciable controversy.

### WHY WE REJECT THE STATE'S ARGUMENTS

The State argues there are three reasons why the Plaintiffs lack standing to bring their claims.

First, the State contends that because the Plaintiffs are complaining about the lack of legislative history or evidence on why

some agency fee funds were exempted from the fee transfers and some funds were not, the Plaintiffs are actually seeking to compare themselves to depositors to other fee funds in which the Plaintiffs have no interest. The State misses the point. It bases this argument on a statement in the Plaintiffs' brief: "There is no legislative history or evidence of the reasons why some targeted funds were exempted [from the fee sweep] while other funds were swept." Clearly, the Plaintiffs are not complaining about what happened to any other fee funds, just the funds they pay into. The State mischaracterizes the focus of the Plaintiffs' complaints by isolating one statement in their brief.

Next, the State argues the Plaintiffs' claims are not distinct from the public at large—citing *Bobbett*, contending the propriety of appropriating State funds is an issue of public concern that should be handled by a public officer. We have already rejected this argument based on the unique damages alleged by the Plaintiffs.

Third, the State argues Olson owes no duty to the Plaintiffs and that he was merely acting out his reporting/accounting duties when the fee transfers were recorded. The State goes on to point out it is the *legislature* that directed Olson to make the transfer, and that it was the *agencies* that assessed increased fees and assessments upon the Plaintiffs, not Olson.

The logic employed in *Sac and Fox* leads us to the opposite conclusion. In that case, the court held the Tribes had standing to sue the Secretary of the Kansas Department of Revenue even though it was the *distributors* who passed the offensive tax on to the Tribes. 213 F.3d at 569, 574. The *Sac and Fox* court confirmed that plaintiffs in such situations may bypass the "middle-man" and pursue action against the State directly. Applying that reasoning here, then, the Plaintiffs have standing to bypass the agencies and sue the State and the state official responsible for sweeping the accounts—Olson.

## ADDITIONAL ARGUMENTS RAISED BY THE STATE ARE UNPERSUASIVE

In addition to its arguments about standing, the State also claims the district court lacked subject matter jurisdiction over the Plain-

tiffs' case because it does not meet the "case-or-controversy" requirement. First, the State avers the Plaintiffs' claim is moot because the funds have already been transferred. The money is gone, and a continuation of the case would not change the outcome because the agencies cannot authorize agency expenditures. In making this argument, the State cites no authority suggesting the Plaintiffs could not have received a declaratory judgment that held H.B. 2373 unconstitutional. Also, they do not show that what the legislature did cannot be undone by the legislature. Obviously, the Plaintiffs are not trying to obtain return of the monies from the agencies but from the State through legislative enactment.

Next, the State argues the Plaintiffs' claim for injunctive relief is not ripe because a court cannot enjoin the legislature from passing future legislation, even if the proposed action is in disregard of constitutional duties. This argument stretches the Plaintiffs' petition too far. The Plaintiffs are not attempting to prevent the State from passing future legislation; instead, the Plaintiffs are asking the court to find a law unconstitutional and overturn it.

Finally, the State argues the Plaintiffs' claims are barred by the political question doctrine. The budgetary process is a political process that rests only with elected representatives. The State contends a court cannot presume the legislature did not pass laws for reasons other than those stated by the legislature and that the court cannot step into the shoes of the legislators and second-guess the need to reimburse the State and make expenditures.

This argument misses the mark. Even in the exercise of its considerable powers of the purse, the legislature must conform to the Kansas Constitution. The ruling in *Panhandle* settles that point. The Plaintiffs are challenging the constitutionality of legislation which compels the transfer of agency fee funds to the State's General Fund. See 183 Kan. 803.

The State makes several general arguments at this point, contending the court may not look beyond the language in legislative journals and that the intent of the legislature governs when that intent can be ascertained from the language of the statutory scheme enacted. This means the Plaintiffs here cannot assume these fee transfers were a revenue-raising measure—as the express

language of H.B. 2373 states otherwise. In other words, H.B. 2373 was not a tax because the legislature said it was not a tax.

All of these arguments avoid the real issue here. The Plaintiffs are not challenging the legislature's authority to enact laws during the budgetary process or its authority to approve expenditures. What the Plaintiffs are challenging is the enforceability of a bill that has already been enacted and applied to them. The Plaintiffs are essentially challenging the *reasonableness* of the fee fund transfers that occurred pursuant to what they allege is an unconstitutional law—a proper subject for judicial decision, as previously determined in *Panhandle*. See also *Stephan*, 236 Kan. at 51. In *Stephan*, the court noted that the action did not seek to preclude the legislature from exercising its discretion to enact an unconstitutional law but sought to stop the legislature from acting under the authority of an unconstitutional enactment; the relief requested, therefore, did not require the court to interfere with the legislature's constitutional power to exercise its legislative function but to preclude the legislature from exercising an executive function. 236 Kan. at 51.

The basic point is this: although the legislature is indeed responsible for raising revenue and appropriating funds for the State, there are limits on the legislature's exercise of its powers in this regard. Our Supreme Court in *Panhandle* ruled the State may only reimburse itself for the legitimate costs of supervision and regulation through fee-transfer legislation. 183 Kan. at 806-07. For this reason, all of the State's arguments concerning the legislature's authority to enact laws and make appropriations are actually beside the point.

The State argues *Panhandle* does not support the Plaintiffs' position because *Panhandle* cited Article 11, § 1 of the Kansas Constitution as a basis for its ruling and mineral products such as oil and gas were removed from Article 11 protection after *Panhandle* was decided. The State also argues Article 11 only applies to the assessment of ad valorem taxes.

The question whether *Panhandle* can be distinguished so that it would not support the Plaintiffs' claims on the merits is a question that must be answered later and not now, based on this record that

only deals with standing. Here, where the district court dismissed the Plaintiffs' claims based on standing and jurisdiction alone, we must confine our review to those issues. The district court has made no ruling on the merits. We will not address any issues concerning the merits of the Plaintiffs' claims until the district court has addressed them.

The State also suggests that because H.B. 2373 contains specific language indicating the fee transfers were authorized to reimburse the State for services performed on behalf of the agencies at issue—making this bill different from the one at issue in *Panhandle*—it made the fee transfers in this case per se constitutional. Again, we are not addressing the merits of the case here, just the propriety of the dismissal based on lack of standing.

We reiterate. The Plaintiffs alleged damages that were not suffered by members of the general public. And the fact that members of the public could be harmed if a court provided some possible remedy to the Plaintiffs does not transform their claim into one of public concern that must be brought by a public official. Neither the district court nor the State has provided persuasive authority or even a reasonable rationale for such a holding. The district court erred in determining the Plaintiffs lacked standing to challenge the constitutionality of H.B. 2373.

### WHY THE DISTRICT COURT WAS WRONG WHEN IT HELD THE PLAINTIFFS WERE REQUIRED TO BRING AN ACTION UNDER THE JUDICIAL REVIEW ACT

The district court's second reason for dismissing the Plaintiffs' claim rested on its determination that the Plaintiffs were required to proceed under the Judicial Review Act. The court concluded that because it was the *State agencies* that imposed additional fees and assessments upon the Plaintiffs in response to the fee transfers, the Plaintiffs must seek judicial review of those actions. On appeal, the Plaintiffs claim they were not required to proceed under the Act because they are not challenging the agencies' administrative decisions to assess fees upon them but, instead, they are challenging the legislature's enactment of what they consider an unconstitutional bill that caused the additional fees.

We must first point out that the district court's order accurately demonstrates exactly why the Judicial Review Act was inadequate as a sole theory for relief for these Plaintiffs. The court observed that even if the Plaintiffs had brought their claims under the Act, there would have been no remedy available to them under the Act. The best result that could have been accomplished under the Act would have been a finding that the agencies assessed excessive or unreasonable fees and were, thus, unlawful.

The district court opined that even if such a determination of unlawfulness were made by the court and the Plaintiffs would have been entitled to a rebate from their respective agencies, the Judicial Review Act does not contain a means for curing or enforcing a restoration of funds that were previously dedicated somewhere else. The court also noted the Act has no mechanism for adding parties such as the Director of Accounts and Reports and the State Treasurer, who would be necessary to reverse the transfer of funds as desired by the Plaintiffs.

Besides *Sac and Fox*, several prior cases have permitted this jump "over the middle man" by plaintiffs seeking to expose the illegality of a statute.

In *Busby, Inc. v. Kansas Dept. of Agriculture*, No. 78,499, 1999 WL 499625 (Kan. App.) (unpublished opinion), *rev. denied* 267 Kan. 888 (1999), Busby brought suit against the Kansas Department of Agriculture challenging the constitutionality of a Kansas law that required individuals and entities such as Busby to pay inspection fees for having registered commercial fertilizer in Kansas. Like this case, Busby requested an injunction, class certification, a declaratory judgment deeming the statute unconstitutional, and a "tax refund" of all payments it made under the statute at issue. Busby argued the statute violated the 14th Amendment and the Commerce Clause of the United States Constitution and Article 11, § 1 of the Kansas Constitution. The district court had dismissed Busby's claim for lack of subject matter jurisdiction, finding Busby had failed to make a timely claim under the Judicial Review Act. The district court said that because Busby was challenging agency action, the Judicial Review Act was its exclusive remedy.

In the unpublished opinion, this court reversed the district court's dismissal of the case. Slip op. at 5. In doing so, the court reasoned that because Busby was directly challenging the statute and it was not challenging agency action or the agency's interpretation of a statute, the district court erred in determining the suit was one attacking agency action that must have proceeded under the Judicial Review Act. Slip op. at 3-5. In reaching this conclusion, the court acknowledged that the Judicial Review Act is the exclusive remedy for all requested relief that an agency can grant under its authority. Slip op. at 4. However, the court noted that claims which fall outside the authority of an agency can support a separate action by an aggrieved individual. Slip op. at 4. The court distinguished cases in which a plaintiff does not challenge the constitutionality of a state statute but directly challenges an agency's action or interpretation of a statute. The *Busby* court said that there was "no agency action under attack." Slip op. at 4-5.

After the remand to the district court, that court ruled that Busby lacked standing to challenge the constitutionality of the state statute. On appeal, this court reversed that ruling and held that Busby had standing to challenge the statute and decided the constitutionality question on the merits. *Busby, Inc. v. Kansas Dept. of Agriculture*, 29 Kan. App. 2d 555, 560-64, 29 P.3d 441, *rev. denied* 272 Kan. 1417 (2001).

The case relied upon by the *Busby* panel in the unpublished opinion was *Felten Truck Line v. State Board of Tax Appeals*, 183 Kan. 287, 327 P.2d 836 (1958). It recognized the difference between an attack on agency action and an attack on the law the agency was interpreting. Felten and another corporation (on behalf of themselves and numerous taxpayers) brought an action in mandamus against the State Board of Tax Appeals challenging the constitutionality of a statute that placed a tax on motor carriers and the Tax Commission's interpretation and administration of the act. On appeal, the Commission argued the plaintiffs were required to exhaust their administrative remedies by complaining to the Commission first. Our Supreme Court rejected this argument, stating:

"Insofar as the plaintiffs complain of the commission's valuation of their property and other acts of the commission in its application of the statute, the com-

mission's position is well taken. The commission should not be subjected to litigation in the courts until the alleged error has been called to its attention and it has had an opportunity to consider and correct the grievance. [Citation omitted.]

"However, a different situation exists where the tax statute under which the commission is operating is challenged as unconstitutional. [The statute providing for the administrative proceeding] was not intended to cover a situation where the constitutionality of a tax statute is challenged. The commission is not set up as a court to review the constitutionality of legislative enactments. It is an administrative body. It is the commission's duty to presume that the statutes are constitutional and valid. The plaintiffs had a right to seek court relief on the question of the constitutionality of the statute without first presenting the question to the commission for review." 183 Kan. at 293.

In two other cases, panels of this court have indicated plaintiffs need not proceed under the Judicial Review Act if they are challenging the constitutionality of a state statute and are not challenging agency action in particular.

In *Nora H. Ringler Revocable Family Trust v. Meyer Land and Cattle Co.*, 25 Kan. App. 2d 122, 125, 958 P.2d 1162, *rev. denied* 265 Kan. 886 (1998), the Trust brought suit against the cattle company seeking an injunction that would prevent the company from expanding its water pollution control facilities and seeking an order directing the company to move certain facilities. The district court granted the cattle company's motion for judgment on the pleadings, in part, because it decided the Trust was obligated to first seek judicial review of an adverse determination made by the Kansas Department of Health and Environment. In finding the district court erred in this respect, this court stated:

"Based on the allegations of the petition, plaintiff is not challenging the KDHE order; plaintiff is seeking to enjoin subsequent conduct [by the cattle company] which she alleges violates state law. Since plaintiff is not challenging KDHE's decision to revoke defendants' 1992 permit or the KDHE decision that defendants' facility as of June 1, 1994, was exempt, plaintiff was not required to appeal from the KDHE presiding officer's order of June 1995." 25 Kan. App. 2d at 133.

Similarly, in *Colorado Interstate Gas Co. v. Beshears*, 18 Kan. App. 2d 814, 815, 860 P.2d 56 (1993), *rev. denied* 256 Kan. 994 (1994), two pipeline companies brought suit against the Secretary of Revenue, contending they were being treated disparately for tax purposes in violation of Article 11, § 1 of the Kansas Constitution.

Both the Board of Tax Appeals and the district court dismissed the pipelines' claim for lack of jurisdiction, reasoning the pipelines had failed to object to the Director of Property Valuation's assessed valuations or file a grievance with BOTA. On appeal, this court reversed the district court's dismissal of part of the pipelines' claim. 18 Kan. App. 2d at 822. This court first recognized the well-known rule that parties must exhaust all administrative remedies before filing a petition for review but noted the law recognizes exceptions where no administrative remedy is available or the remedy is inadequate to address the problem at issue. 18 Kan. App. 2d at 820-21. The *Beshears* court went on to explain that the ultimate power to determine the constitutionality of any agency action rests with the courts, and where no issues lend themselves to administrative determination, plaintiffs should be permitted to seek court relief without presenting their claim to an administrative agency. 18 Kan. App. 2d at 821.

Additionally, the court reasoned that in cases where constitutional questions are an issue, the availability of judicial review is presumed and a statutory scheme should not be read to take the extraordinary measure of foreclosing jurisdiction unless the legislature's intent to do so is shown by clear and convincing evidence. 18 Kan. App. 2d at 821-22. Thus, the court remanded the case to the district court to determine whether the pipelines had presented a constitutional claim that was "at least colorable." 18 Kan. App. 2d at 822.

The State's arguments on this point do not persuade us to a contrary position. The State is correct that K.S.A. 77-606 states the Judicial Review Act "establishes the exclusive means of judicial review of agency action." The State is also correct that the State agencies involved here are not exempted from the Act under K.S.A. 2008 Supp. 77-603(c). But the question in this case is whether the "exclusive means" requirement in the statute even applies in cases where agency action is involved but where the plaintiff is not actually challenging the agency actions. In this appeal, the State disregards this aspect of the issue. The State simply argues that because there was agency action in this case, and because the

Plaintiffs included an agent of the State as a defendant, the Plaintiffs are "complaining about agency action."

The State's argument elevates form over substance. While there was indeed agency action here in that the agencies imposed the additional fees and assessments upon the Plaintiffs, those acts gave the Plaintiffs standing to sue. But the Plaintiffs are really complaining about why the agencies were required to act and not how they acted. Instead, the Plaintiffs are challenging the legislation which resulted in the increased fees and assessments. Here, the case indeed involves agency action, but the Plaintiffs are complaining about the legislature's action and have sued the State, not just Olson.

A different way to look at this problem is to determine what the law authorizes agencies to do. After all, the Kansas Judicial Review Act "is the exclusive remedy for all requested relief *which an agency can grant under its authority.*" (Emphasis added.) *Douglass v. Kansas State University,* 22 Kan. App. 2d 171, 174, 915 P.2d 782, *rev. denied* 259 Kan. 927 (1996). No state agency has the authority to declare a law unconstitutional.

According to K.S.A. 40-103:

"The commissioner of insurance shall have general supervision, control and regulation of corporations, companies, associations, societies, exchanges, partnerships or persons authorized to transact the business of insurance, indemnity or suretyship in this state and shall have the power to make all reasonable rules and regulations necessary to enforce the laws of this state relating thereto."

There is no mention of any authority to find an insurance law unconstitutional.

Turning to the Real Estate Commission, an examination of K.S.A. 2012 Supp. 74-4202 reveals the "commission shall receive applications for, and issue licenses to, brokers and salespersons, as provided in the real estate brokers' and salespersons' license act. . . . The commission may do all things necessary and convenient for carrying into effect the provisions of the acts . . . ." Again, there is no mention of any authority to declare a law unconstitutional.

Finally along this line, the statute describing the duties of the Bank Commissioner, K.S.A. 9-1701(a) states:

"The commissioner or the commissioner's assistant or examiners shall visit each bank and trust company at least once every 18 months . . . for the purpose of making a full and careful examination and inquiry into the condition of the affairs of such bank or trust company."

There is no provision in the law granting authority to the Bank Commissioner to declare a banking law unconstitutional.

It defies the logic of the separation of powers doctrine to believe that a state agency, a creation of the legislature, charged by law with the enforcement of a certain set of laws, has any power to declare the enactments of its creator unconstitutional and unenforceable. Because those state agencies have no authority to grant the relief sought by the Plaintiffs, the Judicial Review Act was not the exclusive remedy available to the Plaintiffs.

The caselaw supports the Plaintiffs' position that they were not required to proceed according to the Judicial Review Act. Like *Busby* and *Felten,* the Plaintiffs are not complaining about how their respective agencies interpreted or applied the statutes. In fact, the Plaintiffs are not challenging the agencies' assessments at all. Instead, they are challenging the constitutionality of legislation that caused the agencies to pass assessments on to the Plaintiffs. It is not agency action that is under attack here. The Plaintiffs are attacking the constitutionality of H.B. 2373 and the actions of the legislature.

And like *Beshears,* the issue raised here is not suited to an administrative determination. See 18 Kan. App. 2d at 821. There would be no good reason to require the Plaintiffs to proceed against the agencies when their claim is not directed at the agencies. A challenge to the constitutionality of H.B. 2373 must be dealt with by the courts, like in *Panhandle*—not by a State agency that has neither authority to grant declaratory judgments nor authority to declare a statute unconstitutional. After all, in *Panhandle,* our Supreme Court took up the merits of a claim nearly identical to the one raised here.

In making its holding concerning the exclusivity of the Judicial Review Act, the district court dismissed entirely the declaratory relief sought by the Plaintiffs. Unlike the laws creating the various

state agencies, K.S.A. 60-1704 provides a means to obtain judicial review of a law:

"Any person . . . whose rights, status or other legal relations are affected by a statute . . . may seek determination of any question of construction or validity arising under that enactment . . . and may obtain a declaration of rights, status or other legal relations thereunder."

Historically, our Supreme Court has approved of declaratory judgments as a vehicle for testing the constitutionality of statutes. " 'It has long been settled courts also have jurisdiction, under the Declaratory Judgment Act, to determine the validity of statutes or ordinances before a party undertakes to act in apparent violation thereof.' " *Acupuncture Society of Kansas v. Kansas State Bd. of Healing Arts*, 226 Kan. 639, 647, 602 P.2d 1311 (1979). If the courts have jurisdiction to declare a statute unconstitutional before the parties act, then the courts certainly have jurisdiction to declare a statute unconstitutional after the party is forced to comply with that law. In addition, *Panhandle* was a declaratory judgment action.

## WE SUMMARILY DISPOSE OF THE REMAINING ISSUES RAISED BY BOTH PARTIES

We look first at the Plaintiffs' additional points. Because we are reversing and remanding this case to the district court for further proceedings, we need not address the Plaintiffs' argument that the district court abused its discretion in dismissing their claim because the court failed to assume as true the allegations set forth in their petition. Also, the district court can consider the issue of class certification on remand, as well.

For its part, the State raises two additional issues. It contends the Defendants are immune from suit and the Plaintiffs cannot bring claims of mandamus and quo warranto. Again, these are matters for the district court to consider on remand when determining the merits of the various claims. We are a court of appeal, and in this appeal we can only review the rulings of the district court that were actually rendered.

Reversed and remanded.